[Civ. No. 20420. Second Dist., Div. Two. May 2, 1955.]

MATELIE DUFF et al., Appellants, v. SCHAEFER AMBU-LANCE SERVICE, INC., et al., Respondents.

William K. Young for Appellants.

Lynch & Reilly, De Forrest Home and Crider, Tilson & Ruppe for Respondents.

FOX, J.—This appeal is the aftermath of three actions for the recovery of personal injury and property damages arising out of an intersectional vehicular collision.

The accident occurred at the intersection of Hope and Temple Streets in Los Angeles on the evening of March 6, 1952, between the hours of 8:30 and 9 o'clock. The vehicles involved were a 1953 Ford automobile owned and driven by defendant Arywitz and an ambulance belonging to the Schaefer Ambulance Service, Inc. (hereinafter called Schaefer), which was being operated by defendant Carl A. Bellanzi. Plaintiffs Matelie Duff and Callie Williams, both of whom

sustained personal injuries, were riding in the Arywitz car. It was proceeding south on Hope when it collided with the eastbound ambulance. The latter was responding to an emergency call at the time of the collision. The occupants of the Ford were bound for downtown Los Angeles after attending a television broadcast in Hollywood sponsored by the Los Angeles County Conference on Community Relations (hereinafter called the County Conference).

Mrs. Duff (hereinafter termed appellant) instituted this action on the theory of negligence for the recovery of damages from defendants Arywitz, Schaefer, Bellanzi, the International Ladies' Garment Workers Union (hereinafter designated Union), and two of its members, Samuel Otto and John Ulene. It was alleged that appellant was a passenger in the Arywitz car and that Arywitz was the agent of both the Union and the two named members and was acting within the scope of his employment when the accident occurred. Appellant's husband was joined as a coplaintiff to recover for loss of consortium. Callie Williams likewise filed an action for damages based on the alleged negligence of the above named defendants. A third action, restricted to property damage resulting from the accident, was brought by Schaefer against Arywitz alone. Among the defenses interposed by Arywitz and the Union to appellant's complaint was the claim that appellant was a guest in the Arywitz car and that Arywitz was neither intoxicated nor guilty of wilful misconduct at the time of the impact. The answer of defendants Schaefer and Bellanzi, so far as is here material, denied negligence in Bellanzi's operation of the ambulance.

The three cases were consolidated for trial before a jury and resulted in verdicts in favor of all the defendants in the Duff and Williams personal injuries actions. Appellant Duff's motion for a new trial was denied. In the property damage action, Schaefer prevailed against Arywitz. The judgment in this latter action, and the judgment adverse to Callie Williams are now final. Mrs. Duff is the sole appellant. She assigns as prejudicial error (1) various rulings on the admissibility of evidence; (2) the giving of certain instructions and the refusal to give others requested by her; and (3) the court's misconception of its duty in ruling on the motion for new trial. Her contentions cannot be sustained.

### Background Facts

The evidence shows that appellant was a resident of South San Gabriel, a suburb of Los Angeles. She was employed

as a seamstress in the garment industry. She became a member of the respondent Union in 1937. At the time of the accident, appellant was vice president of Sportswear Local 266, an affiliate of the Union, and chairman of the local's educational and entertainment committee. These were honorary positions. She received no pecuniary compensation at any time from the Union for the performance of these functions, in which she engaged outside her working hours. On certain occasions when she was involved in activities authorized by the Union she was reimbursed by the Union for her meals and transportation costs. Appellant testified that her responsibilities as a nonpaid functionary of the educational and entertainment committee included the gathering of material of educational value for presentation on the committee's informational programs for the membership.

Appellant testified that when she became committee chairman in 1943 she informed one Louis Levy, since deceased, but then an officer of the Union, that she did not drive a car and would have difficulty in returning home late at night from Los Angeles. Levy, she stated, assured her that transportation would be provided either to her home or to the Pacific Electric Railway Terminal in Los Angeles when she was required to remain in, or come to Los Angeles on behalf of the Union.

Arywitz testified that he occupied the position of director of the education and public relations committee of the Union. He was employed directly by the International Union in New York City, from whom he received a salary of $85 a week. His job was to formulate and carry out a program of educational and recreational activity. This entailed the organization of classes, holding institutes, publishing a Union newspaper, and planning dances, parties and picnics. His duties brought him in contact with defendant Ulene, an officer of Local 266 and manager of the Union's Joint Sportswear Council, and with committee members of the local unions with whom he had occasion to discuss his projects. He sometimes met with officers of Local 266 to apprise them of his contemplated programs. He worked under the supervision of the Pacific Coast Regional Director of the International Union, in whose headquarters his own office was located. He was not subordinate to any official of the local unions or of any of the executive committees.

Arywitz testified that he kept fairly regular office hours—normally from about 9:30 a. m. to 6 p. m. He spent about

80 per cent of his working time in the office, where he attended to the editing of the paper and his work of dictation and correspondence. Only infrequently did he program evening activities for Union members because of the poor response. He owned the Ford car which he used, in part, in connection with his job. In addition to his salary he received a $50 weekly expense allowance. This included the cost of operating his car for business purposes and charges incurred for food and drinks in the entertainment of out-of-town visitors and civic and political personalities. Arywitz testified that he was never told by anyone that it was his duty, as a part of his job, to transport union members anywhere at any time. Occasionally, he took a member who did not have transportation to a party or some other type of function, but this he did as an individual, out of friendship for and courtesy to such person. He pointed out that other Union members who were not paid employees also transported fellow members to such affairs. He testified that in 1951, at the annual meeting of the county conference, which he attended in his individual capacity because he believed in their objectives, he gave appellant a ride in his car downtown out of friendship to enable her to board a streetcar to her home. Under examination by appellant's counsel as to purported occasions during the period 1949 to 1951 when he allegedly transported appellant in his car on Union business, Arywitz denied that he drove her to look for Union picnic sites, to purchase a gift for Union entertainments or toys for its Christmas party.

On February 27, 1952, a week before the accident, appellant and Mrs. Williams attended a meeting of delegates to the Sportswear Joint Council where defendant Ulene announced that on March 6th a dinner and lecture would be given at the Case Hotel in downtown Los Angeles by an organization known as the Religion and Labor Council. Dinner was to be served at 7 p. m. and the speaker's address was scheduled for 8 p. m. Reservations for the dinner were required by noon on March 5th. The Joint Council voted that delegates who attended would be reimbursed for the dinner charges of $2.00 by the Union upon submission of a voucher. Appellant made no reservation to attend. It was established that the Religion and Labor Council is an independent organization with its own headquarters and officers, and conducts meetings periodically on various subjects throughout the city. It was affiliated with the American Federation of Labor and the Union.

During a Union meeting the night before the accident, which appellant did not attend, the minutes disclose that Mr. Ulene announced the receipt "of an invitation for two members to attend the last broadcast of the season of the Los Angeles County Conference on Community Relations over Station KTTV on March 6th. Volunteers were called for, and Sisters Bayer and Williams volunteered. It was suggested that Sister Billie Duff (appellant) may want to go. Sister Williams advised that she would advise Sister Duff if she wants to attend." At the conclusion of the meeting, Mrs. Williams called at appellant's home, but found she was out. She left a note for appellant telling her to "come dressed, we are going to be on TV." When appellant left home the next morning, she was unaware of the nature of the TV program referred to. In the meantime, Mrs. Bayer, who was the president of Local 266, also an unpaid position, and Mrs. Williams decided to have dinner in Hollywood after the telecast.

Appellant and Mrs. Williams attended Union meetings on March 6th at the close of their working day, and, at about 7 p. m., they joined Mrs. Bayer for the drive to the TV studio in the latter's car. Mrs. Bayer testified that she drove to work about three days a week, and parked her car near the Union office when attending Union meetings. For about the last three years, she had received $5.00 a week from the Union "not as a car expense but parking expense." She testified that in connection with the allowance of this parking expense she was never told that it was to include the cost of carrying personnel in her car. She stated that the fact that she received a parking allowance from the Union did not motivate her in taking appellant and Mrs. Williams to the TV studio on March 6th. The record shows also that Mrs. Williams owned a car, but did not drive. She and her daughters lived in El Monte, and they all worked in downtown Los Angeles to which they drove daily, one of the daughters driving. They customarily parked in a parking lot between 8th and 9th Streets on Hill Street, and the car was parked there on the day of the accident. On that day Mrs. Williams planned to meet her daughters at the Olympic Theatre, on 8th Street between Hill and Broadway, at about 10:30 p. m. As appellant and Mrs. Williams and Mrs. Bayer drove to the studio, appellant was informed of, and accepted, the plan to have dinner in Hollywood following the TV broadcast before returning downtown.

After the three ladies took their seats at the TV studio, Arywitz arrived and observed them sitting up front. He conversed with them and Mrs. Bayer told him they were going to stay in Hollywood and have dinner. Arywitz was invited to join them, but declined, stating he had already eaten and that he had a date after the broadcast. Arywitz testified that he was at the county conference meeting as a private individual and had not been requested to attend by anyone connected with the Union. He stated that his working day had ended at 6 p. m., earlier that evening; that he knew a few days in advance of the County Conference on Community Relations broadcast; that it concerned problems of interest to various community organizations, and that labor matters constituted only one phase of the program. The county conference was an organization having its own officers and offices, with which were affiliated such entities as the C.I.O., the A.F. of L., the Urban League, the National Conference of Christians and Jews, and the Negro Conference. Arywitz stated that he was a member of several of the conference's affiliated groups and he had decided to attend the broadcast as a matter of purely personal interest. He testified he had no official function to perform at the broadcast, it being no part of his job to attend a meeting of this character.

By the time the broadcast ended, a heavy rain was falling. This disrupted the ladies' prearranged plan to dine in Hollywood. Mrs. Bayer was willing to drive appellant and Mrs. Williams back to downtown Los Angeles. However, it was suggested that perhaps she might be spared the trip if another ride downtown could be arranged. Arywitz was approached by the three women and asked if he were going downtown. He replied affirmatively and agreed to give appellant and Mrs. Williams a lift. Arywitz and the two women thereupon entered his car and started off. Arywitz's destination was a parking lot adjacent to the Case Hotel at 11th and Broadway, where he had arranged a date with a lady. En route, a discussion was had as to where the ladies were to leave the car. It was finally decided by them that they would alight at 8th and Hill Streets, where Mrs. Williams wished to obtain refreshments. After dinner, since it would be still too early for the 10:30 p. m. appointment at the theatre with Mrs. Williams' daughters, the ladies decided they would look in at the Case Hotel meeting at the Religion and Labor Council, instead of spending the intervening time sitting in

Mrs. Williams' car in the parking lot. It was while Arywitz was proceeding to the restaurant at 8th and Hill Streets, which was about four blocks from his rendezvous with his lady friend, that the accident occurred sometime between 8:30 and 9 p. m. A representative of the Religion and Labor Council testified that its Case Hotel dinner and lecture was over by 9 p. m., and all those in attendance had departed by 9:15.

### Guest Statute and Scope of Employment

Fundamental to appellant's theory of liability against Arywitz and the Union are the propositions that on the ill-fated ride of March 6, she was a passenger, rather than a guest, in Arywitz's car and that Arywitz was acting within the scope of his employment with the Union in furnishing transportation for her. We regard neither of these points as valid.

The questions here presented are not novel. Much has been said by appellate courts and text writers on these subjects, and the guiding principles of law are reasonably clear. In cases having to do with the "guest" statute,* the status of an injured occupant of a vehicle either as a "guest" or a "passenger" of the driver at the time of the accident, depends on the vital factor of whether the occupant or someone on his behalf was "giving compensation for such ride" in the sense in which that term is used in section 403 of the Vehicle Code. (*Whitechat* v. *Guyette*, 19 Cal.2d 428, 430 [122 P.2d 47].) By giving compensation for the ride, the occupant becomes a passenger in the vehicle. ■ Because of the infinite variety of situations under which passage in an automobile is offered and accepted, the modern concept of what amounts to "giving compensation" for the ride is an elastic one, and where conflicting inferences may be drawn from the evidence, it is a factual question as to whether a rider's status is that of a passenger or guest. (*Kohle* v. *Sinnett*, 118 Cal.App.2d 126, 128 [257 P.2d 483]; *Gosselin* v. *Hawkins*, 95 Cal.App.2d 857, 861 [214 P.2d 110].) ■ To constitute compensation within the statute, the rider need not pay for

---

*Section 403 of the Vehicle Code reads: ''No person who as a guest accepts a ride in any vehicle upon a highway without giving compensation for such ride, nor any other person, has any right of action for civil damages against the driver of such vehicle or against any other person legally liable for the conduct of such driver on account of personal injury to or the death of such guest during such ride, unless the plaintiff in any such action establishes that such injury or death proximately resulted from the intoxication or wilful misconduct of said driver.''

the transportation solely in cash or its equivalent. (*Malloy v. Fong;* 37 Cal.2d 356, 376-378 [232 P.2d 241].) ■ Where the trip is not primarily for a social purpose, it suffices if the occupant gives such recompense for the ride or confers such benefit on the driver as makes it worthwhile for him to furnish the ride. (*Brandis* v. *Goldanski,* 117 Cal.App.2d 42, 45 [255 P.2d 36]; *Follansbee* v. *Benzenberg,* 122 Cal. App.2d 466, 471 [265 P.2d 183].) ■ The requisite compensation for the transportation may be provided by someone other than the driver. (*Thompson* v. *Lacey,* 42 Cal.2d 443, 447 [267 P.2d 1].)

In the Goldanski case, *supra,* the court, in a cogent analysis of the trend of recent decisions, points out that "even though the purpose of a trip is pleasure or social, the rider may be a passenger if the driver actually receives for the trip something intended as compensation." (P. 47.) However, it was there held, upon abundant authority, that where the ride is offered for mutual pleasure or as an act of hospitality, such mere exchange of social courtesies is not a benefit amounting to compensation so as to make a rider a passenger and not a guest (p. 49). ■ That conclusion, of course, comports with the fundamental policy underlying guest statutes, which is to prevent recovery for ordinary negligence by a guest in an automobile who has accepted the hospitality of the driver. (*Kruzie* v. *Sanders,* 23 Cal.2d 237, 241 [143 P.2d 704].) ■ Where, as here, wilful misconduct or intoxication on the part of the driver is not involved, the occupant of the car has the burden of proving that he was a passenger rather than a guest. (*Kroiss* v. *Butler,* 129 Cal. App.2d 550, 556 [277 P.2d 873]; *Gosselin* v. *Hawkins, supra.*)

The law relating to the question of whether at the time of the accident Arywitz was acting in the service of his employer has found expression in numerous cases considering the relationship of principal and agent, master and servant, and in cases arising under the workmen's compensation act. ■ In general, where it is established that the driver of a car was the servant or agent of defendant employer and that his use of the vehicle was a contemplated incident of his agency, before liability is fastened on the employer the plaintiff must show that at the time of the injury complained of the servant was engaged in performing a service for the master or some act incidental thereto. (*Kish* v. *California State Auto Assn.,* 190 Cal. 246, 248-249 [212 P. 27]; *Clough* v. *Allen,* 115 Cal.App. 330, 332 [1 P.2d 545]; *Hall* v. *Puente*

*Oil Co.*, 47 Cal.App. 611, 614 [191 P. 39].) ■ The general rule is further refined in *Lockheed Aircraft Corp.* v. *Industrial Acc. Com.*, 28 Cal.2d 756, 758-759 [172 P.2d 1], so that "where the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly or indirectly could he have been serving his employer." In *Loper* v. *Morrison*, 23 Cal.2d 600, 605-606 [145 P.2d 1], the court stated: "In each case involving scope of employment all of the relevant circumstances must be considered and weighed in relation to one another [citations] . . . the factors to be considered . . . are the intent of the employee, the nature, time and place of his conduct, his actual and implied authority, the work he was hired to do, the incidental acts that the employer should reasonably have expected would be done, and the amount of freedom allowed the employee in performing his duties."

### NONLIABILITY OF ARYWITZ AND THE UNION

■ Applying the foregoing rules, it is clear that the evidence amply sustains the implied findings of the jury that appellant was a guest in Arywitz's car and that Arywitz was not acting within the scope of his employment at the time of the collision. The evidence obviously accepted by the jury shows that on the day in question Arywitz had finished his day's work and had gone home, with no further duties for the Union on his schedule. His time thereafter was his own, to use as he pleased. His presence at the KTTV program was the result of private choice, because of his interest in its sociological content and was dissociated from any duty he owed the Union arising out of his employment. He was neither expected to attend such meeting nor, being there, to engage in any functions connected with his job. Furthermore, there is no evidence to show any obligation on Arywitz's part to supply transportation to appellant to downtown Los Angeles. Arywitz's prearranged activities for the evening called for him to keep a date with a lady near the Case Hotel. Appellant, on the other hand, was not sent to the KTTV program as a Union representative or delegate. She had left her home on the morning of March 6th without even knowing what type of broadcast she would attend and later fell in with her friend's plans to have dinner in Hollywood after the broadcast. It was simply

an unexpected mischance of the elements which altered these plans. It was also a fortuitous occurrence that Arywitz was in the studio and that he happened to be going downtown on a social engagement. On being asked if they might accompany him, he graciously consented to convey them to the café where Mrs. Williams wished to dine, near his own destination.

Clearly the jury could reasonably have found that the work for the Union had no part in creating the necessity for Arywitz's trip, which he would have made in all events and which had no possible connection with the duties he owed the Union. Also, they could have found that appellant was in Arywitz's car merely as a guest accepting an act of courtesy and accommodation extended to her by a friend going her way. That no benefit tantamount to compensation passed to Arywitz nor motivated him in taking appellant on the trip he was making is fully supported by the evidence. (*Brandis* v. *Goldanski, supra,* p. 49.)

Appellant urges in support of her position that her uncontradicted testimony was that the late Mr. Levy assured her, almost ten years before the accident, that she would always get transportation to the Pacific Electric terminal when on Union business. She emphasizes also that Arywitz was receiving an expense account for the use of his car from the Union. But neither of these factors compels the fastening of liability on those defendants. In connection with her first point, two principles should be borne in mind. ■■■ The first is that uncorroborated testimony as to an oral declaration of a deceased person is the weakest form of evidence and is open to suspicion; but, where admissible, it will be weighed by the trier of facts the same as other evidence and may be disregarded where shown to be unconvincing or insubstantial. (*Estate of Emerson,* 175 Cal. 724, 727 [167 P. 149].) ■■■ The second is that the trier of fact may reject the uncontradicted testimony of a witness provided he does not act arbitrarily. (*Hicks* v. *Reis,* 21 Cal.2d 654, 659-660 [134 P.2d 788].) Among the relevant considerations in this respect are the character of the evidence, the motives of the witness, and his interest in the result of the case. (*Hicks* v. *Reis, supra; Huth* v. *Katz,* 30 Cal.2d 605, 609 [184 P.2d 521]; *American Trust Co.* v. *Fitzmaurice,* 131 Cal.App.2d 382, 388 [280 P.2d 545].) The jury was not compelled to accept the testimony of appellant as to Levy's alleged promise, either because of the weakness of this type of evidence or because it was not satisfied with

the veracity of appellant's testimony as an adverse party. As to the second point, the mere fact that Arywitz was receiving an expense account from the Union did not of itself make the Union liable for an injury sustained by appellant at a time when appellant was in the car as a guest and Arywitz was engaged in a mission for exclusively his own pleasure divorced from any duties he owed to his employer or to appellant. (*Hall* v. *Puente Oil Co.*, 47 Cal.App. 611, 614-615 [191 P. 39].) As stated in *Kish* v. *California State Automobile Assn.*, 190 Cal. 246, 251 [212 P.2d 7]: "To so hold would be to make the employers (sic) business co-extensive with the employee's expense account and extend the liability of the employer for the acts of a servant as being within the scope of employment to acts having no relation whatever to the actual business of the employer and to the accomplishment of the results for which the servant was hired."

## Rulings on the Evidence

Appellant makes multifarious attacks upon the ruling of the court in the admission and exclusion of evidence. In order properly to evaluate these rulings it is necessary to bear in mind, at least so far as the liability of defendant Arywitz and the Union is concerned, that the character of the transportation venture by which Arywitz undertook to drive appellant and Mrs. Williams from the telecast in Hollywood to downtown Los Angeles and his relation to the Union during such venture, are crucial. The person in the best position to testify on this subject was Arywitz, for he had primary knowledge of his own purpose and intention, and the extent of his agency. While his statement, of course, would not be conclusive, it was nevertheless competent, contrary to appellant's assertion, for him to testify that he attended the telecast as a private individual and not as a representative of the Union (*Hirshfeld* v. *Dana*, 193 Cal. 142 [223 P. 451]), and that providing transportation downtown for appellant and Mrs. Williams was not within the scope of his employment but rather a personal matter, "as an act of friendship." (*Kast* v. *Miller & Lux*, 159 Cal. 723, 727-728 [115 P. 932].) It was likewise competent for him to testify that his day's work was finished at 6 p. m. Appellant's objections to questions which developed the above testimony were properly overruled. Appellant, however, argues that the court unduly restricted the cross-examination of Arywitz respecting his interest in attending Union activities

and his knowledge of her interest in being present at such meetings. It is, of course, axiomatic that the extent of cross-examination is largely a matter resting in the sound discretion of the trial court, and that restriction thereof is not a basis for reversal of a judgment in the absence of a clear abuse of such discretion. There is obviously no such abuse here. The incident to which appellant directs special attention relates to a prior meeting at Pepperdine College of the Los Angeles County Conference on Community Relations, which was attended by her and Arywitz. He testified, in response to Mr. Young's questions, that he attended this meeting ''as a private individual'' because he was interested in the organization and believed in what it was doing. Objection was thereupon sustained to the later question: ''What was the interest you had in being there then?'' The ruling was correct for the subject matter had been sufficiently explored. Notwithstanding that, Mr. Young's next question was: ''You had no other interest except that which you have related?'' to which the witness replied, ''None whatever.'' Inquiry was then made whether he knew what appellant's interest was in attending this meeting. Objection on the ground that the question called for a conclusion was properly sustained. Counsel thereupon asked Arywitz whether appellant advised him on that occasion what her reason was for being present. Upon an objection's being sustained counsel did not pursue the matter. The question called for hearsay so far as defendant Union was concerned. Furthermore, no offer of proof was made. Since the question did not indicate the answer would be favorable to appellant such an offer was necessary in order to have the matter reviewed on appeal (*Newman* v. *Sunde,* 23 Cal.App.2d 332, 335 [73 P.2d 260]; *Abrams* v. *Hubert,* 10 Cal.App.2d 404, 407 [51 P.2d 884].)

 Appellant complains that she was not permitted to testify relative to transportation furnished her prior to the accident by various Union members. The following question was propounded: ''I wonder if you could tell the jury the various methods of transportation you have had in private passenger cars insofar as members of the Union are concerned?'' Clearly this was immaterial to any issues here involved. Counsel, however, suggested he would establish that the persons who gave her rides were on expense accounts with the Union. This would not render such testimony material since there was no showing or offer to show that

the persons who provided these rides were acting within the scope of any authorization or direction by the Union. (*Kish* v. *California State Automobile Assn., supra.*)

Appellant also complains that she was not permitted to testify that ''prior to the collision she was present in the automobile of Arywitz because of Union activities on numerous occasions.'' Here again there was no showing of any basis for binding the Union in connection with any of these isolated rides. In an apparent effort to establish such a basis, counsel for appellant examined Arywitz under section 2055, Code of Civil Procedure, relative to each of these asserted rides. Counsel was not able, however, to tie the Union into any of them. In fact, Arywitz denied having taken appellant on most of these trips. On infrequent occasions when he did give her a ride it was done solely as an act of friendship.

Appellant claims to be aggrieved because the court excluded evidence of (1) previous rides in Mrs. Bayer's car; (2) a voucher of the Union indicating payment of automobile expense to Mrs. Bayer; and (3) transportation charges of $2.00 assertedly paid by the Union to Mrs. Bayer for each member of the education committee she carried to an institute at Mar Vista. We perceive no error in the rulings on these matters. In this connection it will be recalled that although Mrs. Bayer was an official of the Union she was not a paid employee of the Union. She testified she received ''no car expense'' for the use of her automobile but the Union allowed her $5.00 a week for ''parking expense.'' It is thus clear that under this arrangement the Union was not paying for the rides that Mrs. Bayer gave appellant. The voucher that was excluded (Plaintiff's Exhibit No. 4 for identification) was drawn in favor of Mrs. Bayer for $5.00 under date of August 31, 1951. There was a notation for car expense. This may well have been a receipt for one of her weekly payments for parking expense or pay for some special use of her car. In either event it was not here material. It was likewise immaterial whether Mrs. Bayer received $2.00 for each passenger transported to an institute at Mar Vista on some prior occasion. Special arrangements made for particular transportation could not have any bearing on the issues in this case.

Finally, the question of whether Mrs. Bayer was receiving compensation for transporting appellant and Mrs. Williams from downtown Los Angeles to the telecast in Hollywood

should be set at rest completely by her own testimony:
"Q. On the night of March 6, 1952, when you took Mrs.
Duff (appellant) and Mrs. Williams out to KTTV did you
do that because you were getting some money from the Union?
. . . A. No, sir."

Evidence that appellant attended the annual convention
of the Union as a delegate and as such was provided trans-
portation was properly rejected. There is no parallel between
official representation of the Union at its annual convention
and attending the telecast at KTTV which was not sponsored
by her Union but by another organization and which she
attended voluntarily and not in any official capacity.

It was not error to exclude testimony that the Union had
defrayed transportation expenses of appellant on other occa-
sions such as meetings of the Union held at Asilomar and
visits to the City of Hope since such evidence had no proba-
tive value to establish that on the night in question Arywitz
was providing transportation for her on behalf of the Union
or that compensation was given therefor. It must be remem-
bered that the testimony of appellant herself affirmatively
established that it was only by the merest circumstance that
she had ridden with Arywitz that night. In order to save
Mrs. Bayer the drive downtown in the rain the ladies sought
other transportation for appellant and Mrs. Williams. Arywitz
was contacted and agreed to accommodate the two ladies since
he was going downtown anyway to pick up his "date."

It was not error, as appellant asserts, to admit
in evidence the minutes of the board of directors of the
Sportswear Joint Council showing that the Union's repre-
sentation at the TV program was to be restricted to two
members, and that she was not included. These minutes
were prima facie evidence of the facts stated therein. (Corp.
Code, § 832.) They were not self-serving declarations in
any sense of the word but were routine minutes representing
action taken at a time when no litigation was contemplated.
Appellant, however, claims error in the exclusion of testimony
by Director Roberts purporting to contradict recitals in the
minutes with respect to the designation of two persons to
attend the telecast. There was actually no contradiction for
her statement was: "I don't remember the number two ever
having been mentioned . . ." This witness sought to volun-
teer on two occasions that they were all invited to attend
this broadcast. This statement was not in response to any
question and was therefore stricken by the court as not re-

sponsive. Appellant's assertion of prejudicial error in this ruling is without substance.

Appellant contends that the court erred in excluding (1) conversations between her and Mrs. Williams respecting their contemplated attendance at the dinner meeting at the Case Hotel at 7 o'clock on the evening of the accident; (2) evidence that such affairs were customarily tardy in getting started; and (3) her explanation of the nature of this affair. The rulings were correct. The conversations were hearsay and there was an absence of any foundation to establish authority on the part of these two ladies to bind the Union by such conversations. The practice of not getting such dinners started on schedule was not material to any issue in this case. This is made obvious by the testimony of witness Carstens, who was head of the Religion and Labor Council which put on the dinner, that it started, as scheduled, at 7 o'clock and was over by 9 p. m., which was only a few minutes from the time the accident occurred. In connection with this dinner, it should be noted that appellant received the same invitation that was extended to the entire joint council. She was not delegated to attend the affair. With this factual background it was not error, as appellant asserts, to strike her explanation of the nature of the dinner-meeting at the hotel.

Appellant charges prejudice (1) in the admission of the contents of a signed statement by Mrs. Williams which was used to impeach the latter's testimony; (2) in the refusal to allow Mrs. Williams to explain the circumstances under which the statement was signed; and (3) in rejecting her statement that she did not understand certain expressions used therein. At the time the impeaching statement of Mrs. Williams was admitted the court did not limit it in any way to Mrs. Williams' case, since she, also, was a witness for appellant. However, the error, if such there was, in any aspect of the ruling, was cured by instruction ''L'' which reads as follows: ''There has been offered by defendant Union and received in evidence a statement in writing signed by plaintiff Callie Williams upon the ground that the same was an admission by her against her own interest. It may therefore be considered by you as evidence in the case against plaintiff Callie Williams.

''With reference to the written statement of plaintiff Callie Williams [just] mentioned, you are instructed that the same shall not be considered by you as prejudicing the rights of

plaintiffs Duff, and you are instructed that said written statement is not binding upon plaintiffs Duff.''

It may have been error, insofar as Mrs. Williams' own case was concerned, not to permit her to explain her lack of understanding of certain terms used in the statement she signed and not to allow her to explain the circumstances under which she signed it but she is not appealing the decision in her case. However, such limitation on her testimony could not in any event be prejudicial to appellant's case in view of the instruction quoted above.

During the course of Mrs. Williams' testimony she referred to the person who took her statement as ''a man from the insurance company of the Union.'' Because of this reference the Union and Arywitz requested, and the court gave, an instruction that the jurors should not speculate about or discuss whether or not there was insurance in the case; that this was a subject with which they were not concerned and that it should not enter into their deliberations ''in any manner.'' In view of Mrs. Williams' observation, it was entirely proper to advise the jury that it should not be concerned with whether there was insurance involved. Appellant, however, claims the inclusion in the instruction of the quoted phrase was prejudicial in that it took from the jury's consideration any bias or interest on the part of this man and how such matters affected him in preparing the statement. There is no merit in this argument, particularly in view of instruction ''L'' which advised the jury that the Williams' written statement should not be considered as prejudicing the rights of, or ''binding'' upon, appellant.

### No Prejudicial Error in the Instructions

Appellant claims prejudice in the giving of certain instructions captioned ''D,'' ''F,'' ''G,'' ''H,'' and ''I.'' We perceive no merit in this contention. She assigns as error in Instruction ''D'' the statement that no liability would attach to Arywitz and the Union unless the jury found ''that (1) compensation was given for the transportation from KTTV to Los Angeles; (2) that in providing the transportation Mr. Arywitz was the agent of the Union in so doing; and (3) was acting within the course and scope of his employment in providing such transportation; . . .'' Appellant claims that point (1) of the instruction requires her to show that she had given compensation for the ride. This is

not so. It correctly requires a showing that "compensation was given" and in Instruction "G" compensation is defined to include a benefit accruing to the Union. This part of the instruction is therefore unobjectionable. She further asserts that it was unnecessary for her to establish point (3) if she had established points (1) and (2) above. While points 2 and 3 when read together are somewhat redundant, both essentially relate to whether Arywitz, the Union's agent, was acting within the scope of his employment at the time of the injury. Plaintiff was not prejudiced by the addition of the words "and was acting within the course and scope of his employment." The complaint alleges and the answer denies that Arywitz was acting "within the course and scope of his employment" and the evidence on the issue was conflicting. No error appears from the tenor of the instruction as a whole. (*Garcia* v. *City of Santa Monica*, 92 Cal.App.2d 53, 55 [206 P.2d 37].)

Appellant challenges the propriety of instructions "G" and "I." These instructions are, perhaps, not worded as felicitously as might be desired. However, an examination of the instructions shows that, in essence, they accurately stated the law that compensation would be present if the trip served to accomplish a purpose of, or was of benefit to, the Union, but that it would be lacking if the motivating influence for the ride was merely the extension of a personal courtesy or an accommodation solely for appellant's convenience. (*Humphreys* v. *San Francisco Area Council, Boy Scouts*, 22 Cal.2d 436 [139 P.2d 941]; *Brandis* v. *Goldanski, supra.*) Basically, they left for the jury to determine whether appellant was simply a guest or whether compensation in the statutory sense was rendered or received for the journey. (*Gosselin* v. *Hawkins*, 95 Cal.App.2d 857, 861 [214 P.2d 110].)

The court gave to the jury Instruction "F" in the following language: "The fact that defendant Arywitz may have been allowed car expense as part of his compensation does not of itself prove that it was part of his job to transport the plaintiffs from one place to another. Such evidence is to be considered only as one of the facts and circumstances bearing upon the question of the nature and extent of Mr. Arywitz's employment and the scope of his duties to be performed on behalf of the Union." Appellant claims that the instruction charged upon a matter of fact. The first sentence of the instruction is a correct statement of the law. (*Kish* v. *California State Automobile Assn., supra.*) There

is no undue emphasis on any testimonial facts in this brief instruction nor is there any trespass on the jury's function of evaluating and finding the facts. The instruction clearly leaves it to the jury to appraise all of the circumstances bearing on the question of scope of employment in accord with other instructions appropriately covering the general subject.

 Appellant attacks Instruction "H" which reads as follows: "Plaintiffs Duff and Williams claim that at the time of the accident they were enroute to the Case Hotel at 11th and Broadway to attend a meeting of the Religious and Labor Council. The burden is on plaintiffs to prove this fact by a preponderance of the evidence, and unless they maintain such burden of proof your verdict must be in favor of Arywitz and I.L.G.W.U. If at the time of the accident their destination had no connection with any meeting at the Case Hotel, your verdict would be against said plaintiffs as to said defendants." This attack is unwarranted when read in relation to the charge as a whole. The jury was fully instructed on the subject of "guest" and "passenger" and the matter of "compensation" had been thoroughly defined and explained. The doctrine of *respondeat superior* had likewise been covered. However, it was appellant's contention that when the collision occurred she was en route to the meeting at the Case Hotel. It was respondent's contention that Arywitz's riders were going to a restaurant at or near Eighth and Hill to eat and then wait for Mrs. Williams' daughters to leave the movie theatre. The criticized instruction was not a formula instruction purporting to embody all the elements of liability but, in conjunction with other instructions, advised the jury that unless appellant's destination was the Case Hotel on the business of or at the behest of the Union she could not recover. The instruction as a whole had a natural basis in the evidence. Clearly, if appellant was going directly to a downtown eating place rather than to a Hollywood restaurant because of an unanticipated change of plans, and if Arywitz was taking her there merely as an act of courtesy, neither Arywitz nor the Union would be liable. Under other instructions given, the jury could decide whether appellant's presence at the telecast was on a Union mission, whether it wished to believe appellant's testimony that a deceased Union official promised she would always have transportation "either home or back to the P. E. Station" and whether Arywitz was transporting her in line with his Union duties or to discharge the Union's

obligation. In this context, no error of a prejudicial nature appears.

Appellant contends that the court erred in refusing two instructions offered by her. The first one reads: "You are instructed that section 403 Vehicle Code, and commonly known as the guest law, whereby a person carried in a vehicle without reward is deprived of the right to recover damages for injuries caused by the breach of ordinary care, is in derogation of the common law and must be construed strictly against the change of the former law which authorized recovery prior to the enactment of such guest law." It will be noted that as proposed the instruction reads that section 403 [of the Vehicle Code] was to be "construed strictly *against* the change of the former law." (Italics added.) Assuming the proffered proposition of law to be a proper subject of instruction to the jury, its wording is of such a nature as would strongly tend to mislead and confuse the jury. As the Union points out, if section 403 is to be strictly construed, it is simply the language of said section which is to be so construed; it does not mean, in the inept language of the requested instruction, that it is to be strictly construed against any former law or "against the change of the former law."

Equally without merit is the claim that the refusal to give another instruction was prejudicially erroneous. This read as follows: "In determining whether there is an agreement by defendant Union to provide plaintiff Matelie Duff with transportation in connection with the performance of her activities on behalf of defendant Union, you are instructed that said agreement may be implied from the circumstances and uniform course of conduct of the parties." While the instruction is unobjectionable as a statement of law, it is unsupported by the record in the form requested. Appellant was not relying on an implied understanding between herself and the Union. Her contention throughout the trial was that there was an express agreement that she was to have transportation to her home or to the Pacific Electric Station when on Union business. Her testimony as to other rides represented an effort to establish the existence of such an agreement. It was never appellant's theory that there was an implied agreement. In addition, the language of the instruction tells the jury categorically that there was a "uniform course of conduct by the parties." This was clearly obnoxious in the state of the record. The function of instructions is to give the jury the law which it shall apply to the facts

as it finds them from the evidence. The court properly refused to introduce facts into the instruction, without any qualification, which might well lead the jury to believe that in its opinion, the existence of a uniform course of conduct among the parties had been established. (See *Estate of Keegan,* 139 Cal. 123, 128 [72 P. 828].)

Appellant next complains that two requested instructions, "I" and "J," were rejected by the court. The gist of these instructions was that the scope of Arywitz's employment need not have been expressly conferred on him, but might be implied from the nature of his employment and the duties incident to it, in furtherance of his work; that if the act in question was calculated to result directly, indirectly or incidentally to the employer's benefit, it was within the scope of the employee's job. However, all of the proper elements in instructions "I" and "J" were incorporated in appellant's Instruction 54-D[1] which was given. Appellant was not entitled to other instructions to the same effect in different language. Similarly, it was not error to refuse Instruction "K" which dealt in the abstract with the foundations of liability under the doctrine of *qui facit per alium facit per se,* and was a paraphrase of language in *Carr* v. *Wm. C. Crowell Co.,* 28 Cal.2d 652 [171 P.2d 5], a case dealing with an employee's tortious conduct. The language copied was not used in any instruction in the Carr case. "It does not follow because a trial court does not give an instruction in the language employed by an appellate court in reasoning out a proposition of law or elaborating upon it that error is thus committed. The most that the trial court is required to do is to give instructions which will embody clearly the principles of law under which the jury is to apply the evidence in the case before them." (*Bundy* v. *Sierra Lbr. Co.,* 149 Cal. 772, 781 [87 P. 622].) In the case at bar, the jury was properly instructed on the Union's liability for an employee's negligence.

Appellant also urges that Instruction 54-D, Adapted,

[1]Instruction No. 54-D reads: "It is not necessary that a specific act, or failure to act, be authorized as such by the principal to bring it within the scope of the agent's authority. It is within the scope of his authority if it is done while the agent is engaged in the transaction of business which has been assigned to him for attention by his principal, or while the agent is doing any reasonable thing which his contract of employment expressly or impliedly authorizes him to do and which may reasonably be said to have been contemplated by that contract as necessarily or probably incidental to the employment."

should not have been given.[2] It is possibly true that the first part of this instruction may, upon careful analysis, be subject to criticism as somewhat inaccurate, or perhaps in partial conflict with other instructions. ▮ However, as stated in *Popejoy* v. *Hannon*, 37 Cal.2d 159, 168 [231 P.2d 484]: "Prejudicial error does not necessarily result from the giving of an instruction which, subjected to meticulous analysis, might be given a 'possible construction' making it subject to 'criticism.' It is extremely doubtful that the jurors analyzed the instruction with such exactitude as counsel for the Hannons." We are of the opinion that when the entire instructions are reviewed and considered together, any seeming mistake in the questioned instruction does not constitute reversible error. The case at bar was one in which several actions were consolidated for trial and a great many instructions fully and correctly stating the law on the various issues were given.

▮ Pertinent here is the following language from *Wells* v. *Lloyd*, 21 Cal.2d 452, 458 [132 P.2d 471]: "It does not follow, however, that the giving of conflicting instructions will always mislead the jury and warrant a reversal. [Citations.] In reviewing instructions, the appellate court must read the charge as a whole and give the instructions a reasonable construction from the standpoint of their probable effect upon the jury. [Citations.] Thus, in appraising the instructions given in *Loeb* v. *Kimmerle*, 215 Cal. 143 [9 P.2d 199], this court concluded that the giving of conflicting or contradictory instructions was not ground for reversal of the judgment when the instruction containing the misstatement of law was involved and obscure as compared with the clear and explicit charge embodying the correct statement of law." To the same effect is *Soares* v. *Barson*, 12 Cal.App.2d 582, 587 [55 P.2d 1283].

▮ Appellant is mistaken in her assertion that the judgment against Arywitz in the property damage action brought by Schaefer is res judicata on the question of the liability of Arywitz or the Union to her. The Union was not a party to that action, nor was the agency or the scope of employ-

---

[2]No. 54-D, Adapted: "In determining whether or not the defendant Arywitz was acting as an agent of the Union and within the scope of his employment or authority at the time of the accident, you are instructed that it is not sufficient to say that the Union was interested in the objects or purposes of his trip. Such objects or purposes, in order to be within the scope of his authority, must be connected with the transaction or business which had been assigned to Mr. Arywitz by the Union for his attention and as a part of his job."

ment of Arywitz there in issue, on which any liability of the Union would necessarily depend. (*Turner* v. *Mellon*, 41 Cal.2d 45, 46 [257 P.2d 15].) Neither was the effect of the guest statute an issue in that case.

 Appellant assigns as error the refusal to give an instruction embodying the doctrine of res ipsa loquitur. A reading of that reported instruction shows that it assumes Arywitz was the Union's agent at the time of the accident. The court manifestly could not so instruct the jury as a matter of law. In any event, its refusal clearly was nonprejudicial since in the Schaefer case Arywitz was found to have been negligent, which is the maximum effect an instruction on res ipsa loquitur would have achieved. Similarly, without prejudice was the refusal of two requested instructions on sections 510 and 676 of the Vehicle Code in view of the finding in the Schaefer case that Arywitz was guilty of negligence, which is all appellant could have accomplished by the giving of those instructions. It is elementary that a reversal is not warranted unless it appears probable that a different result would have obtained had the refused instructions been given. (*Horrell* v. *Santa Fe Tank & Tower Co.*, 117 Cal. App.2d 114, 121 [254 P.2d 893].)

### The Schaefer-Bellanzi Judgment

By way of prelude to a consideration of appellant's assignments of error with respect to the judgment in favor of Bellanzi and Schaefer, the events leading up to the accident will be briefly recited. Bellanzi was driving the Schaefer ambulance easterly on Temple Street; the prevailing visibility enabled him to see from a point just east of the Temple-Figueroa intersection to beyond the Temple-Hope intersection, or about two city blocks; his siren was in full operation for a number of blocks before he arrived at the point of impact at the Temple-Hope intersection; the red lights on the ambulance were burning before and at the time of the collision. Bellanzi was operating the ambulance in second gear at a speed of about 15 to 20 miles an hour from the intersection of Flower and Temple, one block west of Hope, up to the time of the crash. As he passed Flower Street, he let his siren down to about the "one-half mark" and the siren again attained its highest pitch just before reaching Hope Street. An independent witness named King testified that when he was immediately east of the intersection of Temple and Hope, he heard the siren sound when the ambulance was about two

blocks west of that intersection. The traffic lights on Temple were either red or changing to red as Bellanzi approached the Hope intersection. It was stipulated that the ambulance was operating as an emergency vehicle. From the foregoing, there is ample support for the jury's implied finding that Bellanzi reasonably exercised the privilege granted by section 454 of the Vehicle Code as outlined in the instructions given by the court. The case cited by appellant, *Washington* v. *City & County of San Francisco*, 123 Cal.App.2d 235 [266 P.2d 828], upheld a judgment for plaintiff on the ground that the evidence was sufficient to show that the operator of the emergency vehicle failed to take advantage of a last clear chance to avoid the accident. There, as here, a factual question was resolved by the jury, supported in each case by substantial evidence.

Appellant complains of the refusal of the court to give instructions 150-B, 150-C, and 138-A. The first two of these instructions were requested not by appellant but by defendant. However, the content and substance of all three of these instructions were embraced in instruction 151(N), given at appellant's request. This instruction reads: ''It is the duty of the driver of any vehicle using a public street or highway to exercise ordinary care to avoid placing himself or another person in danger;' to use like care to avoid an accident from which injury might result; to be vigilant at all times, keeping a lookout for traffic and other conditions to be reasonably anticipated; and to keep the vehicle under such control that, to avoid a collision with any person or with any other object, he can stop as quickly as might be required of him by eventualities that would be anticipated by an ordinary prudent driver in like position.'' Appellant argues, however, that she was deprived of the benefit of instruction 151(N) by the giving of instruction 215-D, which read: ''In connection with instructions that will follow concerning negligence, the duties of drivers of vehicles on a highway, and laws regulating the driving of vehicles and the use of highways, you will keep in mind that they have no application to the driver of the emergency vehicle involved in this case if you should find facts which, under the Court's instructions, entitled him to the exemption heretofore mentioned, and if you should further find that he was not guilty of an arbitrary exercise of the privileges included in that exemption.'' Such instruction was clearly necessary and was couched in proper language. The instructions given immediately after 215-D

related to the standard of care enjoined on drivers of vehicles other than emergency vehicles, whose drivers are permitted to ignore certain traffic regulations if the conditions of section 454 of the Vehicle Code are complied with. It was therefore incumbent on the court to apprise the jury of the statutory exemption provided for this class of drivers, if it found Bellanzi was entitled to such exemption upon the evidence before it.

██ Appellant further contends that the court committed error in refusing to read to the jury section 454 of the Vehicle Code. That section provides: ''The driver of an authorized emergency vehicle shall be exempt from those provisions of this code herein set forth under the following conditions:

''(a) Said exemptions shall apply whenever any said vehicle is being driven in response to an emergency call or when used in the immediate pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm.

''(b) Said exemption shall apply only when the driver of said vehicle sounds a siren as may be reasonably necessary and the vehicle displays a lighted red lamp visible from the front as a warning to others. Under the circumstances hereinabove stated, any said driver shall not be required to observe those regulations contained in Chapter 3 or in Chapter 6 to and including Chapter 13 of Division 9 of this code, but said exemptions shall not relieve the driver of any said vehicle from *the duty to drive with due regard for the safety of all persons using the highway,* nor shall the provisions of this section protect any such driver from the consequences of an arbitrary exercise of the privileges declared in this section.'' (Italics added.)

The court gave to the jury BAJI 215-A[3] which relates

---

Instruction No. 215-A reads: ''One of our statutes provides that, under certain conditions, the driver of an authorized emergency vehicle shall be exempt from, and shall not be required to observe, certain laws that generally apply to the drivers of vehicles on public streets or highways. It will be sufficient at this time to state that the laws to which said exemption applies are those which regulate speed, the use of different lanes on the highway, overtaking and passing of other vehicles, rights of way, rights and duties with respect to pedestrians, streetcars, safety zones, stops, standing and parking.

''It follows that when there exist the conditions which said statute requires as a basis for said exemption, it is not negligence for the driver of such an emergency vehicle to disregard the rules from which he thus

to the exemption, and its limitations, accorded the driver of an emergency vehicle by section 454. That instruction, while it does not specifically employ the phrase italicized *supra*, is so worded as to embody accurately the restricted significance attributed to the words "due regard" as interpreted in the context of that section. (*Reed* v. *Simpson*, 32 Cal.2d 444, 449 [196 P.2d 895]; *Lucas* v. *City of Los Angeles*, 10 Cal.2d 476, 483 [75 P.2d 599]; *Goldstein* v. *Rogers*, 93 Cal.App.2d 201, 208 [208 P.2d 719].) The cases last cited, as well as such cases as *Raynor* v. *City of Arcata*, 11 Cal.2d 113, 117 [77 P.2d 1054]; *Head* v. *Wilson*, 36 Cal.App.2d 244, 247 [97 P.2d 509], and *Stone* v. *San Francisco*, 27 Cal.App.2d 34, 39 [80 P.2d 175], have firmly established the proposition that

---

is exempted, unless he is guilty of an arbitrary exercise of the privileges embraced in that exemption.

"It is equally important to note, however, that the exemption does not apply if any one of the conditions upon which it is based is, in fact, absent, and in such a case, the driver of the emergency vehicle has no privileges over other drivers on the highway; it then is his duty to obey the laws that apply generally to the use of the highway; and he is held to the same duty of exercising ordinary care.

"The conditions heretofore mentioned as being necessary in order that said exemption may prevail are these:

"First, that the vehicle is being driven in response to an emergency call, or that it is being used in the immediate pursuit of an actual or suspected violator of the law, or that it is going to a reported fire, or to a locality where a fire was indicated to be, in response to a fire alarm.

"Second, that the driver sounds a siren in a way that is reasonably necessary to give warning of his approach to others.

"Third, if the vehicle is being driven at night that it is equipped with at least one lighted lamp displaying red light to the front.

"Even when such conditions exist, it is negligence if the driver of an emergency vehicle is guilty of an arbitrary exercise of the privileges given him by the exemption. But that term 'arbitrary exercise of the privileges,' is not one that you may interpret or apply as you wish. It has a restricted meaning under the law, and your close attention to it is urged.

"An arbitrary exercise of the privileges given by the aforesaid statute take place when, and only when, the driver of an authorized emergency vehicle does something which would constitute negligence if he did not enjoy the exemption, and when one or both of the two sets of circumstances now to be described also exist:

"One: Said vehicle is not being driven in response to an emergency call and is not being used in the immediate pursuit of an actual or suspected violator of the law and is not being using in going to a reported fire, or a locality where a fire is indicated to be, in response to a fire alarm.

"Two: After seeing that some other person has not heard or heeded the warning given, or seeing that no one is in charge of property in his path that otherwise might be moved, or seeing that there is no way in which any other person can reasonably be expected to prevent a collision, the driver of the emergency vehicle, nevertheless, having both the means and reasonable opportunity to avoid such a result, proximately causes an accident producing injury to another."

the "due regard" phrase is essentially satisfied (1) when the driver of the emergency vehicle has, by suitable warning, given the users of the highway an opportunity to yield the right of way, and (2) if, having discovered the peril in which another has unknowingly or negligently become involved despite the operation of the required warning devices, the driver reasonably exercises any last clear chance to avoid the accident.[4] Such an interpretation prevents an emasculation of the legislative intent. This is cogently pointed out in *Reed* v. *Simpson, supra*: "Defendants then argue that even though the trial court did commit error in its instruction embracing such improper statement of the law, that circumstance cannot avail plaintiffs because the decedent did not operate his motorcycle 'with due regard for the safety of all persons using the highway,' as required by the statute. But, as plaintiffs maintain, such duty does not impose the same quantum of care upon the driver of an emergency vehicle as upon motorists generally, for in that event the requirement would have the absurd result of practically nullifying the traffic exemptions expressly granted by the section. So pertinent is the interpretation of the phrase in *Lucas* v. *City of Los Angeles*, 10 Cal.2d 476, where it was said at page 483 [75 P.2d 599] : 'If the driver of an emergency vehicle is at all times required to drive with due regard for the safety of the public as all other drivers are required to do, then all the provisions of these statutes relating to emergency vehicles become meaningless and no privileges are granted to them. *But if his 'due regard' for the safety of others means that he should, by suitable warning, give others a reasonable opportunity to yield the right of way, the statutes become workable for the purposes intended.'* And while the statute does not 'protect [the] driver from the consequences of an arbitrary exercise of the privileges' there granted, '*an arbitrary exercise*' of them '*cannot be predicated upon the elements of speed and failure to observe other rules of the road where a warning has been given.*' . . . 'In such cases speed, right of way, and all other 'rules of the road' are out of the picture.'" (Emphasis added.) In *Goldstein* v. *Rogers, supra*, it was held preju-

---

[4]*Washington* v. *City & County of San Francisco*, 123 Cal.App.2d 235, 241 [266 P.2d 828], treats the failure of the driver to avail himself of the "last clear chance" as a breach of the "due regard" requirement. Such failure has also been treated as an "arbitrary exercise of the privileges" of section 454 (*Lucas* v. *City of Los Angeles*, 10 Cal.2d 476, 483 [75 P.2d 599].) In either event the statutory exemption is forfeited.

dicial error to instruct on section 454 without qualifying instructions explaining the restricted meaning to be ascribed to the "due regard" language of that section. The court obviated this by giving the BAJI instruction fully encompassing the subject with scrupulous regard to the tenor of the judicial decisions defining and clarifying the "due regard" phrase. (*Reed* v. *Simpson, supra*; *Lucas* v. *City of Los Angeles, supra*; *Goldstein* v. *Rogers, supra*.)

 Appellant's final argument is that the trial judge had an erroneous understanding of his duties in passing on her motion for a new trial. She relies on a colloquy that took place between her counsel and the court at the opening of argument on her motion. Counsel drew the court's attention to the opinion of the Chief Justice in *People* v. *Robarge*, 41 Cal.2d 628 [262 P.2d 14], relative to the trial court's duty on a motion for a new trial to independently evaluate ". . . the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict [p. 633]." The trial judge stated he had read the opinion. There is nothing in the judge's comment indicating he did not understand the case, or his duty in the premises, as therein stated. In fact, the inference is quite to the contrary for he pointed out that in considering the facts on a motion for a new trial the court might arrive at a result different from that of the jury. Finally, it must be presumed "That official duty has been regularly performed." (Code Civ. Proc., § 1963, subd. 15.) Appellant's position on this point is completely lacking in merit.

Our examination of the record discloses that during the two weeks' trial plaintiff had a full and fair opportunity to get her evidence before the jury and that the jury was adequately and fairly instructed on the applicable legal principles. Even if a miscroscopic culling of the record discloses some incidental error, we are satisfied it was of an inconsequential character and could have no bearing on the ultimate result. We find nothing in the record indicating a miscarriage of justice. Under such circumstances the judgment may not be reversed. (Calif. Const. art. VI, § 4½.)

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied May 17, 1955, and appellants' petition for a hearing by the Supreme Court was denied June 29, 1955.