[L. A. No. 26660. In Bank. June 21, 1962.]

EDITH TORRES, a Minor, etc., et al., Plaintiffs and Respondents, v. CITY OF LOS ANGELES, Defendant and Appellant.

[L. A. No. 26661. In Bank. June 21, 1962.]

MOSES BOSKETT et al., Plaintiffs and Respondents, v. CITY OF LOS ANGELES, Defendant and Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Herbert Hargrave and Weldon L. Weber, Deputy City Attorneys, for Defendant and Appellant.

Dryden, Harrington, Horgan & Swartz, Vernon G. Foster, James H. Davis, Zeman, Comsky & Fischer and David Comsky for Plaintiffs and Respondents.

Albert E. Nelson, Raoul D. Magana, David M. Harney, John Sloan, Robert E. Ford, Robert N. Stone and Ingemar E. Hoberg as Amici Curiae on behalf of Plaintiffs and Respondents.

WHITE, J.—Defendant, City of Los Angeles in two consolidated actions, appeals from judgments for personal injuries and a wrongful death caused by one of defendant's fire engines after it had collided at an intersection with another of defendant's fire engines while both were answering the same alarm.

The collision occurred at the intersection of San Pedro and Jefferson Streets on June 1, 1958. Engines Nos. 14 and 22 were following prearranged routes in response to an alarm turned in from a box located at 32d and Trinity Streets. These routes are set forth in the rules and regulations of the fire department, with which the firemen drivers were familiar. Engine 14 was being driven west on Jefferson Street by Auto Fireman George Winchester. Engine 22, driven by Auto Fireman Raymond Reischl, was traveling north on San Pedro Street. The engines were both displaying lighted red lights and sounding their sirens. Winchester, who had responded several times to alarms from this box, was aware that Engine No. 22 would be responding to the same alarm. On previous occasions he had observed Engine No. 22 arrive at the intersection of Jefferson and San Pedro Streets after he had passed through the intersection.

Reischl knew that Engine 14 normally would respond to the alarm and that it would cross his own line of travel. He estimated that on a half-dozen to a dozen prior occasions when he had driven north on San Pedro, Engine 14 had used its same response pattern. On at least six prior occasions he had observed Engine 14 pass on Jefferson Street in front of him, usually when he was three blocks south of the Jefferson Street intersection. Reischl conceded that, to his knowledge, there are many factors which may delay the other engine from reaching the intersection as much as a half-minute or a minute; that there are situations which might result in a speed-up in the departure of his own engine and that he was aware of these possible time variations on the morning of the accident.

Due to the fact that noise produced by the siren and air horn of each engine makes it nearly impossible for the driver to hear the approach of other emergency units, each driver was instructed in training that he should anticipate that another emergency vehicle may enter the intersection simultaneously with his own and also that more than one piece of equipment may come from a single fire house so that when one truck passes in front of a driver, the hazard is not eliminated.

Fire department rules required each driver, when approaching an intersection in which the paths of emergency vehicles crossed, to bring their vehicles to a stop or near stop and that "extreme caution shall be exercised and the apparatus brought to a complete stop if necessary" at all intersections, particularly where a stop signal was displayed.

Winchester testified that he entered the intersection from the east at approximately 20-25 miles per hour with his foot on the brake, that he made observation of the condition of traffic and observed the traffic signal at the intersection of San Pedro, which was green for easterly and westerly traffic. He did not observe Engine 22 until immediately before the impact.

Prior to the collision, Reischl driving Engine 22 had not observed Engine 14 pass in front of him as he had done on prior occasions. He approached the intersection from the south at a speed of about 40 miles per hour and entered it at a speed of 25-30 miles per hour at which time the signal was red for the direction in which he was going. The approach of Engine 14 from the right was first observed by the acting company officer of Engine 22, when the latter had reached a point about 50 feet south of the crosswalk at the south side of the intersection. Reischl was asked if he had looked to his right at any time between a point 100 feet back from the crosswalk at the intersection and the time that he arrived at the intersection. He replied: "I can't say that I did or didn't." When his deposition was taken, Reischl stated that "If the rig had been there I would have seen it if I had looked." Reischl also testified that he had not paid any attention to the signal and that "We carry our own signal with us."

Engine 14 hit the right rear of Engine 22, propelling it in a clockwise direction and causing it to collide with the Torres automobile which had pulled to the side of Jefferson Street and parked in obedience to the siren. The Torres automobile was in turn propelled into the Boskett automobile which had stopped for the same reason. The collision resulted in the death of Mrs. Torres, and injuries to Mr. Torres, their daughter, Edith, and both Mr. and Mrs. Boskett. The jury rendered judgments for the plaintiffs, totalling $186,500. Defendant does not assert that the verdict is not supported by substantial evidence.

The issues raised at the trial level and on this appeal involve claimed exemptions for municipalities from liabilities resulting from conduct which otherwise would constitute actionable

negligence. Generally speaking, section 400 of the Vehicle Code[1] imposes liability upon a municipality for the negligent operation of a motor vehicle by an officer, agent or employee of the municipality. However, section 454 of the Vehicle Code provides:

"The driver of an authorized emergency vehicle shall be exempt from those provisions of this code herein set forth under the following conditions:

"(a) Said exemptions shall apply whenever any said vehicle is being driven in response to an emergency call or while engaged in rescue operations or when used in the immediate pursuit of an actual or suspected violator of the law, or when responding to but not upon returning from a fire alarm.

"(b) Said exemptions shall apply only when the driver of said vehicle sounds a siren as may be reasonably necessary and the vehicle displays a lighted red lamp visible from the front as a warning to others. Under the circumstances hereinabove stated, any said driver shall not be required to observe those regulations contained in Chapter 3 or in Chapters 6 to and including Chapter 13 of Division 9 or Section 604 of this code, but said exemptions shall not relieve the driver of any said vehicle from the duty to drive with due regard for the safety of all persons using the highway, nor shall the provisions of this section protect any such driver from the consequences of an arbitrary exercise of the privileges declared in this section."

The trial court instructed the jury that liability may be predicated upon an act or acts outside of the exemptions contained in section 454. Defendant contends that this instruction was erroneous, and that it was also error for the trial court to refuse to instruct that pursuant to section 454 an operator of an emergency vehicle on an emergency run is exempt from all "rules of the road."[2]

Defendant claims that it is the established law of this state

---

[1] All references herein are to the Vehicle Code as it existed at the time of the accident, June 1, 1958. Since that time the code has been repealed and reenacted, and section numbers have been redesignated. (See Stats. 1959, ch. 3, p. 1523.)

[2] The instruction which was given is as follows: ". . . if you find that the accident in question was a direct and proximate result of an act of one or more firemen and that such act was outside the exemption contained in Section 454 of the Vehicle Code, then you must determine this issue: Was this act that proximately caused the accident a negligent act under the instructions and definitions that I have given you?"

The instruction which was refused reads as follows: "Under the provisions of Section 454 of the Vehicle Code, the driver of an emergency vehicle is exempted from the restrictions of speed, right of way, and all

that under section 454 no liability can be imposed upon a municipality for injuries resulting from the negligent operation of an emergency fire engine if the vehicle was then responding to an emergency call and was giving the statutory warning (sounding a siren and displaying a lighted red lamp), unless the operator arbitrarily exercised the privileges declared in section 454.[3] In support of this assertion, defendant cites, among other decisions, *Coltman* v. *City of Beverly Hills* (1940) 40 Cal.App.2d 570 [105 P.2d 153]. In that case two police vehicles responding to an emergency call with each sounding its siren, collided at a street intersection. One of the vehicles was knocked onto the sidewalk and struck a pedestrian who died as a result of the injuries thus sustained. The trial court gave judgment for the city in an action for wrongful death brought by the deceased's parents. The District Court of Appeal, in affirming the judgment without, however, citing any code section, held that *Lucas* v. *City of Los Angeles* (1938) 10 Cal.2d 476 [75 P.2d 599], was controlling and adopted the following language from page 486 of the *Lucas* opinion: "Our conclusions from the foregoing are that *when the operator of an emergency vehicle responding to an emergency call gives the statutory notice of his approach the employer is not liable for injuries to another, unless the operator has made an arbitrary exercise of these privileges. In such cases speed, right of way, and all other 'rules of the road' are out of the picture;* the only questions of fact, insofar as the public owner is concerned, are first, whether there was an emergency call within the terms of the statute; second, whether the statutory warning was given, and third, whether there was an arbitrary exercise of these privileges." (Emphasis added.)

Language excepting operators of emergency vehicles from "rules of the road" crept into recent decisions in this state inadvertently. In *Balthasar* v. *Pacific Elec. Ry. Co.* (1921)

other rules of the road. You are further instructed that the failure to keep a proper lookout is one of the rules of the road to which the exemption applies. If therefore, you should find that the proximate cause of the injuries to plaintiffs in the within case, resulted from the failure to keep a proper lookout by the drivers of the emergency vehicles, you may not base any liability on the part of the defendant City of Los Angeles on that alone."

[3] "Arbitrary exercise of the privileges" has been equated with wilful misconduct in the sense of "an act performed either with knowledge that serious injury to another will probably result or with wanton and reckless disregard of the possible consequences." (*West* v. *City of San Diego*, 54 Cal.2d 469, 474 [6 Cal.Rptr. 289, 353 P.2d 929].)

187 Cal. 302 [202 P. 37, 19 A.L.R. 452], it was claimed that the operator of a municipal fire engine on an emergency run was contributorily negligent for exceeding the speed limit and violating turning regulations established by the Motor Vehicle Act of 1917. (Stats. 1917, pp. 382, 404.) The court held that under the then prevailing rule of sovereign immunity the municipality was not contributively negligent, and stated at page 308: "It follows that the general rules of the road relating to speed and to the turning of corners contained in the Motor Vehicle Act do not apply to fire or police apparatus." At that time there was a marginal note entitled "Rules of road" set opposite section 20 of the Vehicle Act which enumerated the various rules imposed by the statute on operators of vehicles. (Stats. 1917, ch. 218, p. 400.) The broad and general exemption from liability would naturally follow for so long a time as the doctrine of sovereign immunity prevailed.

With the enactment of section 1714½ of the Civil Code in 1929[4] the doctrine of sovereign immunity was declared to be inapplicable as to negligent operation of vehicles by an agent of a municipality. This would have had the effect of extinguishing the broad exemptions based upon that doctrine, except as to such exemptions as the Legislature then or later reimposed. Nevertheless the concept that municipalities were exempt from observing the "rules of the road" in emergency situations continued to find expression, if not an exact meaning, in the reported opinions. To some extent this was justified by the statutory language continuing to prevail. Thus in *Lucas* (*Lucas* v. *City of Los Angeles* (1938), *supra*, 10 Cal.2d 476) the court was called upon to apply the law as existing prior to statutory changes which were made in 1935 and 1937 and hereinafter discussed. As stated, there was then no general immunity from liability for the negligent operation of municipally owned and operated vehicles. However, there were provisions of law which, while not setting out specific exemptions from liability, nevertheless set emergency vehicles apart from other municipally owned vehicles in general. Such provisions did little more than state a policy, and it was incumbent upon the courts, in giving meaning thereto, to define the limits of the exemption. The law prevailing in the *Lucas*

[4]Enacted in 1929, Civil Code section 1714½ established responsibility on the part of governmental agencies to persons injured as a result of the negligent operation of motor vehicles owned by such governmental agencies. (Stats. 1929, § 1, ch. 260, p. 565.) This section was the forerunner of section 400 of the Vehicle Code, applicable in the instant action.

case in sections 132 and 120 of the Vehicle Act provided for specific exemptions only as to the right of way for emergency vehicles[5] and speed regulations.[6] However, at the same session of the Legislature which imposed liability for the negligent driving of municipal vehicles (Civ. Code, § 1714½ as adopted, Stats. 1929, ch. 260, p. 565) policemen and firemen were also exempted from personal liability for "any act" arising out of their operation of a vehicle in the line of duty and upon an emergency call. (Stats. 1929, § 1, ch. 263, p. 568.) The court concluded in the *Lucas* case, *supra,* at page 483: "All these sections must be read together and construed together because they all relate to the same subject-matter. The first imposes a new liability on the state and its public agencies for ordinary negligence in the operation of any motor vehicle. The second exempts all members of the fire and police departments from liability for damage for any act in line of duty. Section 120 of the Vehicle Act exempts the driver from all the restrictions of the act relating to speed, while section 132 expressly grants these vehicles a clear right-of-way and requires all other vehicles to yield to them.

"A simple analysis of these statutory provisions discloses the clear intention of the legislature to recognize the paramount necessity of providing a clear and speedy pathway for such vehicles when actually confronted with the emergency

---

[5]Section 132 of the Vehicle Act was amended in 1929 (Stats. 1929, ch. 253, p. 542) to read as follows: "Exceptions to right of way rule. . . . (b) The driver of a vehicle upon a public highway shall yield the right of way to any authorized emergency vehicle when the latter are [is] operated upon official business and the drivers thereof sound audible signal by siren. This provision shall not relieve the driver of any authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway, nor shall it protect the driver of any such vehicle from the consequence of an arbitrary exercise of such right of way."

[6]Section 120 of the Vehicle Act was amended in 1929 (Stats. 1929, ch. 253, p. 539) by the addition of a second paragraph and as amended read as follows: ". . . The provisions of this act regulating the speed of vehicles shall not apply to authorized emergency vehicles as defined in this act when such vehicles are being operated in the chase or apprehension of violators of the law or of persons charged with or suspected of any such violation nor when traveling in response to a fire alarm nor to the vehicles of licensed physicians when traveling in response to emergency calls.

"The provisions of this section shall not, however, relieve the driver of any authorized emergency vehicle or the vehicle of a licensed physician from the duty to drive with due regard for the safety of all persons using the highway, nor shall it protect the driver of any such vehicle from the consequence of an arbitrary exercise of the privileges declared in this section."

in which the entire public may be assumed to be concerned.'' The court further took note of the fact that the Legislature had not undertaken to effect changes in the courts' declaration that emergency vehicles were exempt from the ''rules of the road,'' although it had amended the Vehicle Act in other respects. There was, accordingly, justification for the conclusion stated in the *Lucas* case, *supra,* that emergency vehicles continued to enjoy the broad exemption from all ''rules of the road.''

Following the *Lucas* case there were substantial changes made in the provisions affecting the exemptions of emergency vehicles. Sections 120 and 132 of the Vehicle Act were repealed and section 454 of the Vehicle Code was added. This section, for the first time, enumerated in detail the specific exemptions available to qualifying vehicles and the conditions which made the exemptions available. The provisions of section 454 were almost identical with those in the section as amended in 1957 and applicable to the case at bar.[7] The following are the Vehicle Code provisions from which the designated operators are exempt, as herein applicable: section 604, which prohibits driving the wrong way on a one-way street; chapter 3 of division 9 requiring in sections 465 through 478, compliance with traffic signs, signals and markings; chapter 6 of division 9 requiring, in sections 510 through 517, observance of speed laws; chapter 7 of division 9 specifying, in sections 525 through 534, the sides or lanes of highways or roadways on which vehicles are to be driven, and the regulations for overtaking and passing other vehicles; chapter 8 of division 9 prescribing, in sections 540 through 546, signals and methods for turning, stopping and starting vehicles; chapter 9 of division 9 prescribing, in sections 550 through 555, for the right of way at intersections and crossings; chapter 10 of division 9 setting out, in sections 560 through 565, the rights and duties of pedestrians; chapter 11 of division 9 prohibiting, in sections 570 through 572, the overtaking and passing of street cars at particular times and the driving of vehicles into or through safety zones; chapter 12 of division 9 requiring, in sections 575 through 577, the observance of special signals and the making of special stops; chapter 13 of division 9 providing, in sections 582 through 592.1, for normal

[7]The 1957 amendment added vehicles engaged in rescue operations to the list of vehicles to which the exemptions apply. (Stats. 1957, ch. 625, p. 1834.) An amendment in 1955 added section 604 of the Vehicle Code to the list of exemptions. (Stats. 1955, ch. 480, p. 952.)

stopping, standing or parking of vehicles. In addition to the foregoing, section 453 of the Vehicle Code, enacted in 1935, was amended in 1937 to provide in part as follows: ". . . The provisions of this code applicable to the drivers of vehicles upon the highways shall apply to the drivers of all vehicles while engaged in the course of employment by this State or any political subdivision thereof or any municipal corporation or district therein including authorized emergency vehicles *subject to those exemptions granted such authorized emergency vehicles in this code.*" (Emphasis added.) (Stats. 1937, ch. 69, p. 167.)

It is readily apparent that the provisions of the Vehicle Code of 1937 differ substantially from those of the Vehicle Act of 1923, as amended and construed in the *Lucas* case, *supra.* ▮▮▮ The scope of section 454 was reviewed in *Peerless Laundry Services, Ltd.* v. *City of Los Angeles* (1952) 109 Cal.App.2d 703 [241 P.2d 269], where the city contended that if statutory warning signals were given, the city could be held liable only if it should be found that the driver of the emergency vehicle there involved was guilty of an arbitrary exercise of the privileges granted him. The court held at page 706 that "[t]he liability of appellant [city] can be founded upon general principles of negligence. Section 454 does not bar recovery under the circumstances presented. The vehicular regulations from which exemption is granted relate to speed, right of way, pedestrian duties, streetcars and safety zones, stopping, standing and parking. *There is no blanket exemption of municipalities from all the rules that govern the operation of motor vehicles. The Legislature has not declared that negligence may not be predicated upon acts or conduct not exempt.* Accordingly, if the harm caused results from negligence not based upon an exempt restriction, section 454 is inapplicable and the city must be held responsible by virtue of section 400 of the Vehicle Code. . . ." (Emphasis added.) (See also *Yarrow* v. *State of California* (1960) 53 Cal.2d 427, 442 [2 Cal.Rptr. 137, 348 P.2d 687]; *Cavagnaro* v. *City of Napa* (1948) 86 Cal.App.2d 517, 523-524 [195 P.2d 25]; *Gibson* v. *State of California* (1960) 184 Cal.App.2d 6, 9-11 [7 Cal.Rptr. 315].)

We are in full accord with the statement in the *Peerless* case as to the extent of the exemption available outside of those specifically set forth in section 454. The legislative expression which the court sought in the *Lucas* case could not have been more explicitly stated in the amendments to the

Vehicle Act beginning in 1935, particularly in view of the further declaration therein to the effect that only those exemptions granted in the Vehicle Act were available to the drivers of emergency vehicles.

The statement largely attributable to the *Balthasar* and *Lucas* cases, *supra,* that there exists an exemption from the "rules of the road" for emergency vehicles appears in many of the cases following the decision in the *Lucas* case. That expression has invariably been used without definition and always in speaking of the exemptions for emergency vehicles. (See *Raynor* v. *City of Arcata,* 11 Cal.2d 113, 117 [77 P.2d 1054].) If in employing the expression we can attribute thereto nothing more than a convenient catchall intended to include only such rules from which an operator of an emergency vehicle was duly exempt at the particular time the phrase was used, no harm resulted other than the perpetuation of a certain indefiniteness in the law. In certain instances the broad language of exemption has been quoted where it went beyond that necessary to the decision therein rendered. (See *Reed* v. *Simpson,* 32 Cal.2d 444, 450-451 [196 P.2d 895]; *Duff* v. *Schaefer Ambulance Service, Inc.,* 132 Cal.App.2d 655, 683-685 [283 P.2d 91].) But in other instances the intent was to hold that a general exemption, in the nature of that of the *Balthasar* and *Lucas* cases, continued to exist in addition to or inclusive of the specified statutory exemptions. Such holdings or implications of such holdings must be and are disapproved for the reasons heretofore stated. (See also *Davidson* v. *County of Marin,* 147 Cal.App.2d 54, 59 [304 P.2d 743]; *Isaacs* v. *City & County of San Francisco,* 73 Cal.App.2d 621, 626 [167 P.2d 221]; *Coltman* v. *City of Beverly Hills, supra,* 40 Cal. App.2d 570, 572-573.)

The foregoing and other decisions following the *Lucas* case, in reliance on the then prevailing rule that emergency vehicles were exempt from the "rules of the road," construed that portion of section 454 requiring that an operator of an emergency vehicle "drive with due regard for the safety of all persons using the highway" to mean only that "he should, by suitable warning, give others a reasonable opportunity to yield the right of way." (*Lucas* v. *City of Los Angeles, supra,* 10 Cal.2d 476, 483; see also *Reed* v. *Simpson, supra,* 32 Cal.2d 444, 449-450; *Davidson* v. *County of Marin, supra,* 147 Cal.App.2d 54, 62; *Duff* v. *Schaefer Ambulance Service, Inc., supra,* 132 Cal.App.2d 655, 685; *Coltman* v. *City of Beverly Hills, supra,* 40 Cal.App.2d 570, 572-573; *Head* v. *Wilson,* 36 Cal.App.2d

244, 247 [97 P.2d 509]; *Stone* v. *City & County of San Francisco*, 27 Cal.App.2d 34, 38-39 [80 P.2d 175].) In view of what we have held herein it is manifest that "due regard for the safety of all persons using the highway" has now been accorded a broader meaning.

We can attribute to the legislative intent, in addition to the requirement of an adequate warning to others using the highway, the further requirement that the driver of an emergency vehicle exercise that degree of care which, under all the circumstances, would not impose upon others an unreasonable risk of harm. In short the statute exempts the employer of such a driver from liability for negligence attributable to his failure to comply with specified statutory provisions, but it does not in any manner purport to exempt the employer from liability due to negligence attributable to the driver's failure to maintain that standard of care imposed by the common law. We held as much in an analogous situation in *Yarrow* v. *State of California, supra,* 53 Cal.2d 427. That case did not deal with exemptions for emergency vehicles, but instead with exemptions for vehicles engaged in road construction pursuant to section 453 of the Vehicle Code. We said there, beginning at page 440: "Section 453 . . . provides as follows: '. . . (b) The provisions of this code shall not apply to public employees and publicly owned teams, motor vehicles and other equipment while actually engaged in work upon the surface of a highway, or work of installation, removal, repairing or maintaining traffic signs, signals or other traffic control devices, but shall apply to such persons and vehicles when traveling to or from such work. . . .' The provisions of section 453, subdivision (b) seem to be clearly limited to the penal consequences of violations of Vehicle Code regulations and not to operate to relieve the public employee or the public employer from civil liability for personal or property damage caused by negligent operation of motor vehicles by public employees while so engaged. . . .[N]either the public employer nor the public employee appears to be relieved from ordinary negligence in the operation of motor vehicles in connection with actual work upon the highway. . . . It might well be argued either that the public employer is relieved from *per se* negligence or imputed liability, and is still subject to common law negligence and its waiver of its common law immunity, or that it is liable for both *per se* negligence and common law negligence. The former appears to be the more reasonable solution. . . ."

That standard of conduct which is reasonable under all the circumstances must, of course, take into consideration the unusual circumstances confronting the driver of an emergency vehicle, that is, the emergency which necessitates immediate action and the duty imposed upon the driver to take reasonable, necessary measures to alleviate the emergency. Persuasive authority in other jurisdictions are in substantial agreement with our view herein. In *Baltimore City* v. *Fire Ins. Salvage Corps* (1959) 219 Md. 75 [148 A.2d 444], the court expressly rejected the reasoning of the *Lucas* case, *supra*, in the following language beginning at page 80: "The appellant earnestly urges us to adopt what may be called the California rule. In interpreting statutes somewhat similar to ours, that State has held that if the audible signal be given, 'speed, right of way, and all other "rules of the road" are out of the picture,' and the driver cannot be held responsible for ordinary negligence, but only for 'an arbitrary exercise of these privileges'. . . . However, we think the correct rule is that adopted by the Supreme Court of Wisconsin in *Montalto* v. *Fond du Lac County* (1956) 272 Wis. 552 [76 N.W.2d 279] (Wis., 1956)." The court then made the following observations as to the standard of conduct for an emergency driver at page 82: "In holding that operators of authorized emergency vehicles are liable for ordinary negligence under the statutes mentioned, we do not, of course, mean to state that their conduct in the operation of such vehicles is measured by exactly the same yardstick as the actions of the operators of conventional vehicles. The urgency of their missions demands that they respond to calls with celerity and as expeditiously as is reasonably possible. . . . However, they are bound to exercise reasonable precautions against the extraordinary dangers of the situation that the proper performance of their duties compels them to create. When dealing with the operation of emergency vehicles, it is particularly appropriate to recognize that negligence and reasonable care are *relative* terms and their application depends upon the *situation* of the parties and the *degree* of care and vigilance which *circumstances* reasonably impose. Negligence and reasonable care derive their only significance from a factual background, and that background must contain evidence of circumstances which justify a legitimate inference that in the exercise of reasonable care and prudence injury could have been avoided. . . . We are dealing here with a situation that involves the operators of two emergency vehicles, each having all of the privileges

granted to such operators and each having the same obligation to exercise such care and control as an ordinarily careful and prudent person would exercise under like circumstances.''

In the Wisconsin case referred to in the foregoing quotation (*Montalto* v. *Fond du Lac County,* 272 Wis. 552 [76 N.W.2d 279]) two infant pedestrians were injured when struck by an ambulance operated by one Rozek on an emergency call. In affirming a judgment for plaintiffs the Supreme Court of Wisconsin stated at page 562: ''Rozek was also found negligent as to lookout. Appellants argue that, even though lookout is not included in the exemptions . . . his lookout must be measured against a standard less than that of ordinary care because, being permitted to exceed the speed limit, he could not maintain as efficient a lookout as is possible when driving at the statutory speed. The argument is untenable. In our opinion, a driver must maintain an efficient lookout regardless of his speed. Indeed, if his speed is greater than the statutory limit, it is incumbent upon him to maintain a sharper lookout simply because he will have less time in which to react to any hazard that may arise in his path.'' That court also expressly rejected, after reviewing the California decisions on which the appellants relied, their contention ''that at the time of the accident the ambulance was an emergency vehicle answering an emergency call and that, therefore, ordinary negligence on the part of Rozek was out of the case.'' (P. 557.) See also *Horsham Fire Co.* v. *Ft. Washington Fire Co.,* 383 Pa. 404 [119 A.2d 71], where the court said at page 412: ''The object of a fire truck's journey is not merely to make a show of rushing to a fire, but actually to get there. If the driver is to ignore all elements of safety driving at breakneck speed through obviously imperilling hazards, he may not only kill others en route, but he may frustrate the whole object of the mission and not get there at all!''

The Supreme Court of Nevada, in *Johnson* v. *Brown* (1959) 75 Nev. 437 [345 P.2d 754], has rejected the decisional law heretofore existing in California with the following language at page 442: ''It is clear to us that the majority and better rule in opposition to the California rule as expressed in the *Lucas* case, *supra,* and requires the driver of an emergency vehicle answering an emergency call to exercise reasonable precautions against the extraordinary dangers of the situation which duty compels him to create, and he must keep in mind the speed at which his vehicle is traveling and the probable consequences of his disregard of traffic signals and other rules

of the road." And at page 445, the court continued: "While we are not unmindful that the Reno ordinances and state statutes are designed to give emergency vehicles extraordinary rights, they were not intended to absolve the drivers thereof from the duty to be on the lookout at all times for the safety of the public whose peril is increased by their exemptions from the rules of the road. We believe that sound public policy requires such a construction." To the same or similar effect, see *Russell* v. *Nadeau* (1943) 139 Me. 286 [29 A.2d 916]; *City of Miami* v. *Thigpen* (1942) 151 Fla. 800 [11 So.2d 300]; *Henderson* v. *Watson* (Ky. 1953) 262 S.W.2d 811; *Ruth* v. *Rhodes* (1947) 66 Ariz. 129 [185 P.2d 304]; *Grammier-Dismukes Co.* v. *Payton* (Tex.Civ.App. 1929) 22 S.W.2d 544.

In construing statutory language similar to that in section 454 of the Vehicle Code, requiring that an emergency operator "drive with due regard for the safety" of others, the Supreme Court of Michigan in *City of Kalamazoo* v. *Priest* (1951) 331 Mich. 43 [49 N.W.2d 52] also disagreed with the then prevailing California construction of the statute. The Michigan court stated at page 46: "It will be noted that the quoted statute, according emergency vehicles the right-of-way, conditions the same upon the sounding of an audible signal by siren, et cetera. In addition, the statute expressly provides that the driver thereof shall not be relieved from the duty to drive with due regard for the safety of others. The statute exempting such driver from speed limits contains a like provision concerning due regard for the safety of others. Plaintiff cites cases such as *Isaacs* v. *City & County of San Francisco* . . . and *Lucas* v. *City of Los Angeles* . . . for the proposition that the statutory requirement of due regard for the safety of others is met by the giving of suitable warning. Had such been the legislative intent in the enactment of the Michigan statute, which expressly requires the giving of an audible warning as a condition precedent to an emergency vehicle's acquiring the right-of-way, no purpose would have been served by the further express requirement of the statute that such vehicle be driven with due regard for the safety of others. . . . Driving a fire truck into an intersection in full reliance upon the right to exceed speed limits and the right to proceed without stopping for the stop sign or the through street, but without observing or giving any heed to oncoming traffic on the intersection through street did not amount to driving with due regard for the safety of others as required by statute. . . . Inasmuch as the statute has not relieved driv-

ers of fire trucks from the same duties to maintain a lookout, to see and heed what is present to be seen, and, on the basis of such observation, to form a reasonable belief that it is safe to proceed, it follows inescapably that . . . [the municipality's] driver must likewise be held to have been guilty of contributory negligence as a matter of law. . . ." (See also *Calvert Fire Ins. Co.* v. *Hall Funeral Home* (La.App. 1953) 68 So.2d 626, 629.) It should be noted that the California statute (Veh. Code, § 454, subd. (b)), like the Michigan statute, requires as a prerequisite for the statutory exemptions the giving of an adequate warning of the existence of an emergency, and if we construe the further requirement of "due regard for the safety" of others to mean only the giving of that same warning, then the latter requirement would likewise serve no purpose.

 From the foregoing it is manifest that as to such conduct not specifically exempt from the imposition of liability, the degree of care lawfully imposed upon the agents or the employees of a municipality is that care consistent with the exercise of ordinary prudence in all the prevailing circumstances, including those circumstances manifest at the time of an emergency call. The question to be asked is what would a reasonable, prudent emergency driver do under all of the circumstances, including that of the emergency. In no event, however, can a municipality justify an arbitrary exercise of emergency privileges conferred by statute.

 Weighed in the crucible of the foregoing legal principles and their application to the issues presented by the case now engaging our attention, we are satisfied that the trial court committed no error in instructing the jury that it might find the act of one or more firemen outside the exemptions of section 454, or in refusing to instruct the jury that the driver of an emergency vehicle is exempted under section 454 from the restrictions of speed, right of way and all other rules of the road, as defendant requested.

Defendant next contends that the verdicts of the jury awarding a total of $186,500 are not supported by the evidence and "clearly show indulgence by the jury in reckless prodigality while under the influence of passion, prejudice and sympathy."

 Edith Torres was awarded $100,000 for her personal injuries. She was 14 years of age at the time of the accident and 16 at the time of the trial. There was testimony that

the force of the initial impact caused her to be thrown forward across the front seat from the rear seat where she had been sitting immediately prior to the first impact. The second impact caused her to be thrown back against the rear seat. She was confined to a hospital for nine days during which time X-rays were taken and she was put into a body cast. Following her release from the hospital, she suffered from constant pain and wore a body cast for an additional period of three months during which time cortisone medication was administered. At the trial, Edith testified that the medication relieved the acute pains from which she suffered, but she continued to feel a dull aching. She stated that she suffers pain when she bends over and when lying in bed, that she has difficulty in sitting in any position for any length of time, and that in the months immediately prior to the trial she began experiencing tingling and twitching in the area of her back. She is unable to do any physical work around the home and unable to participate in school athletics because of the pain in her back. She tires easily. Her teachers testified that since the time of the accident her grades have fallen off and that she is no longer in the highest group of the class but is in the sixth and lowest group. She is unable to remain seated in school, but must stand frequently to alleviate her discomfort.

Three orthopedic surgeons who had examined Edith and had taken X-rays and made medical records both at the time of her initial hospitalization and throughout the course of her treatment testified that she had suffered compression fractures of the second, third and fourth lumbar vertebrae, a splitting fracture of the spinous process of the second lumbar vertebrae, a fracture of the neural arch in the vicinity of the sacrum, and that her injuries were of a permanent nature. These experts further testified that Edith suffered from a disease known as ankylosing spondylitis, a peculiar type of arthritis in the back area caused by the effects of the traumatic injuries. The disease ultimately leads to a condition which is referred to as ''bamboo'' or ''poker spine'' unless it can be made to respond to therapy. All of the soft tissues in the joints become one solid mass of bone or bony substance. The process of treatment is an extremely painful one because calcium is deposited in the area of the nerves which protrude from the spinal column. The pain is eliminated only when the spine ultimately becomes fused. Cortisone medication provides temporary relief but there is danger in the continuation of

the use of cortisone as it causes excessive retention of body fluids producing physical changes. Upon the normal completion of the ankylosing process, Edith's spine will be fused in a hunched-over position unless, by means of body casts or braces, it is caused to remain in a permanently erect position. There was testimony that with X-ray treatment the ankylosing process may be arrested but that the presently existing effects would not be eliminated. Edith has refused to submit to X-ray therapy, however, because of fear of gonadal damage which might prevent her from having children.

Plaintiff concedes that there was conflicting testimony by defendant's medical experts, but it is apparent that in making the instant award of damages the jury resolved the conflicts in favor of Edith. The trial court in the exercise of its discretion denied defendant's motion for a new trial and refused to reduce the damages.

 Because injuries are rarely identical in nature and the amount of pain and suffering endured as a result of similar physical injuries varies greatly, the extent of damages suffered cannot be measured by an absolute monetary standard. (*Crystal Pier Amusement Co.* v. *Cannan,* 219 Cal. 184, 192 [25 P.2d 839, 91 A.L.R. 1357].) The determinations of the jury and trial court are therefore entitled to great weight and should be upheld wherever reasonably possible. (*Johnston* v. *Long,* 30 Cal.2d 54, 77 [181 P.2d 645].) As this court stated recently in *Seffert* v. *Los Angeles Transit Lines,* 56 Cal.2d 498, 506-509 [15 Cal.Rptr. 161, 364 P.2d 337], "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court (*McChristian* v. *Popkin,* 75 Cal.App.2d 249, 263 [171 P.2d 85])....

". . . Basically, the question that should be decided by the appellate courts is whether or not the verdict is so out of line with reason that it shocks the conscience and necessarily implies that the verdict must have been the result of passion and prejudice."

 Applying the foregoing rules, and in light of the testimony above narrated, it does not appear that as a matter of law the verdict for Edith can be held to be excessive, or

that any error was committed by the trial court in refusing to grant a new trial or reassess the damages.

 Arnulfo Torres and his daughter Edith were awarded $63,000 as damages for the wrongful death of Mrs. Torres, wife and mother, who had a life expectancy of 21.9 years. Defendant contends that even if Mrs. Torres had continued to be gainfully employed at a wage of $85 a week this verdict evidences the existence of passion and prejudice on the part of the jury. It asserts that her future earnings (figured at the rate of $85 a week, 48 weeks a year from age 57 to age 73) amount to only about $2,500 more than the jury's award. It further urges that no deductions for taxes, and her living expenses could have been made by the jury, and that the evidence does not justify such a large award for the damage suffered by Mr. Torres and Edith resulting from noneconomic losses such as society, comfort and protection.

Mrs. Torres' employer testified that had she lived, she would have earned $90 a week and that she received vacation with pay. Her earnings through age 73 would then total $74,880 (figured at $90 a week, 52 weeks a year for 16 years), or almost $12,000 more than the $63,000 verdict.

There was also testimony that Mrs. Torres did the cooking, cleaning and generally managed the family's affairs. Mr. Torres' physical condition requires that he limit himself to mild activities only. Mrs. Torres also, of course, had the care and counseling of her adolescent daughter before the former's death.

In *Lasater* v. *Oakland Scavenger Co.* (1945) 71 Cal.App.2d 217, 220 [162 P.2d 486], the court held that $100 per month would be a reasonable figure to use to determine the pecuniary loss to the husband of his wife's services. Assuming that Mrs. Torres could continue to do the housework to age 67 or for 10 more years, approximately Mr. Torres' life expectancy, the pecuniary loss to Mr. Torres alone reaches $12,000. In *Burke* v. *City & County of San Francisco* (1952) 111 Cal.App.2d 314 [244 P.2d 708], an award of $50,000 to a surviving husband and two adult children for the wrongful death of the wife and mother with a life expectancy of 23 years was held not excessive although the deceased wife's income was only $35 a month.

In view of the foregoing we are persuaded that the verdict for wrongful death is not excessive as a matter of law. Certainly the award is not so large as to "shock the conscience."

The following awards for personal injuries were made to

the remaining plaintiffs: Arnulfo Torres, $10,000; Moses Boskett, $7,500; Mattie Boskett, $6,000. The testimony detailing the nature and extent of their injuries need not be repeated here, as there is ample evidence in the record to support these awards; the amounts are reasonable under the circumstances and cannot be said to be the "result of passion and prejudice."

From the foregoing it appears that the trial court's instructions were proper, that it did not err in refusing to give defendant's requested instruction as to section 454 of the Vehicle Code, and that no error was committed in denying defendant's motion for a new trial on the ground that the verdict was excessive.

 Defendant undertakes in each case to appeal from an order denying its motion for a new trial, and an order denying its motion for nonsuit, as well as from the judgments. The orders are not appealable and the attempted appeals therefrom are dismissed. (*Rodriguez* v. *Barnett*, 52 Cal.2d 154, 156 [338 P.2d 907]; *Estate of Roberson*, 114 Cal.App.2d 267, 268 [250 P.2d 179].)

The judgments are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J,. and Dooling, J., concurred.

Appellant's petition for a rehearing was denied July 18, 1962.