Filed 7/22/22 (mod.); pub. order 7/22/22 follows unmodified opinion (attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JENNIFER FRANCIS,<br><br>        Plaintiff and Appellant,<br><br>   v.<br><br>CITY OF LOS ANGELES,<br><br>        Defendant and Respondent. | B301021<br>(Los Angeles County<br>Super. Ct. No. BC526258)<br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>PETITION FOR REHEARING<br>(NO CHANGE IN JUDGMENT) |

THE COURT:

The opinion in the above-entitled matter filed on June 30, 2022 is modified as follows:

On page 13, in the first paragraph, the last sentence and last citation are deleted and replaced with the following:

"In reviewing the denial of a motion for nonsuit . . . , appellate courts, like trial courts, must evaluate the evidence in the light most favorable to the plaintiff." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 263.) We also consider evidence introduced after the motion for nonsuit by any party in evaluating whether there is substantial evidence in the record

that could support a judgment in plaintiff's favor. (*Scrivani v. Dondero* (1900) 128 Cal. 31, 32; *Huber Tool Works, Inc. v. Marchant Calculators, Inc.* (1962) 204 Cal.App.2d 822, 824.)

This modification does not constitute a change in the judgment.

Appellant's petition for rehearing filed on July 15, 2022 is denied.

_____

ROTHSCHILD, P. J.          CHANEY J.          MORI, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/30/22 (unmodified opinion)


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JENNIFER FRANCIS,<br><br>　　　　Plaintiff and Appellant,<br><br>　　v.<br><br>CITY OF LOS ANGELES,<br><br>　　　　Defendant and Respondent. | B301021<br><br>(Los Angeles County<br>Super. Ct. No. BC526258) |

APPEAL from the judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Affirmed.

Taylor & Ring, John C. Taylor, Natalie Weatherford; McNicholas & McNicholas, Matthew S. McNicholas, Courtney M. McNicholas; Esner, Chang & Boyer, Stuart B. Esner, Andrew N. Chang, Holly N. Boyer and Kevin K. Nguyen for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Chief Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney, and Jonathan H. Eisenman, Deputy City Attorney, for Defendant and Respondent.

Jennifer Francis, a criminalist with the Los Angeles Police Department (LAPD), sued her employer, the City of Los Angeles (the City), for violating Labor Code section 1102.5 on a theory of whistleblower retaliation. After the court denied the City's motion for nonsuit, a jury found in favor of the City, and Francis appealed. Among other arguments, Francis contends that a jury instruction and the special verdict form were prejudicially erroneous. In addition to opposing these contentions, the City argues that there is no substantial evidence to support Francis's claim and the court should have granted its motion for nonsuit. We agree with the City and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

In February 1986, Sherri Rasmussen was murdered in her Van Nuys home. She had been severely beaten and shot three times in the chest area. During the LAPD's initial investigation, the "working theory" of the case was that the murder occurred during a "botched burglary" by two men.

In 2003, the Rasmussen case was transferred to the cold case unit of the LAPD's robbery-homicide division. Cliff Shepard was the cold case unit detective handling the case.

In 2004, Francis worked as a criminalist and DNA analyst in the LAPD's serology DNA unit. In late 2004, she responded to a request from Shepard to perform DNA analysis of evidence in the Rasmussen case. She reviewed the file and noted that a female coworker of Rasmussen had threatened Rasmussen. The file also revealed that Rasmussen had been bitten on her arm during the attack and that investigators had taken a swab of the bite mark. Francis learned that the swab had never been "booked into LAPD evidence." After making inquiries, she eventually located the swab at the coroner's office.

Francis analyzed the swab and detected a DNA profile of a female other than Rasmussen. She informed Shepard of her analysis. Based on this result and her review of the file, Francis suspected that the attack on Rasmussen may not have occurred during a burglary, but could have been " 'something more personal.' "

In early 2005, Francis spoke with Shepard and raised the possibility of investigating Rasmussen's coworker. Shepard told Francis, " 'This is a male/female burglary.' " Francis then asked Shepard, " 'What about the other woman? What's the other woman's name?' " Although Francis was asking about Rasmussen's coworker, Shepard responded, " 'You mean the LAPD detective?' " When Francis asked, "What LAPD detective?" Shepard said that Rasmussen's husband had an "on-again, off-again relationship" with a female LAPD detective. Shepard, however, told Francis that the detective was not related to Rasmussen's murder.[1]

In the spring of 2005, Francis again raised the possibility of Rasmussen's coworker as a suspect, but Shepard (in Francis's words) responded in a "really stern voice": " 'This is a male/female burglary.' " Francis took this to mean that she was not supposed to ask any more questions about the case and, in March or April 2005, she stopped working on it. At some point, the Rasmussen murder file was transferred from the cold case unit back to the Van Nuys division of LAPD.

In February 2009, Detective James Nuttall began investigating the Rasmussen case. In the course of his review, he found irregularities in the handling of the evidence and the investigation, such as biological evidence that had been checked out

[1] Shepard testified at trial that he never told Francis that an LAPD officer had been cleared in Rasmussen's case.

of the police evidence locker and never returned and the absence of recorded interviews of witnesses, including Rasmussen's parents and coworkers. He spoke with John Ruetten, Rasmussen's husband, who informed Nuttall that his ex-girlfriend, LAPD officer Stephanie Lazarus, is someone who may have wanted to harm Rasmussen. Ruetten also told Nuttall that he had informed LAPD of Lazarus during the initial murder investigation. Nuttall also spoke with Rasmussen's father, who said that he had made many inquiries to the LAPD in the 1980's and 1990's to determine whether someone had investigated Ruetten's former girlfriend, whom he identified as an LAPD officer. According to Nuttall, however, the case file revealed no indication that anyone had interviewed Lazarus or considered her a suspect.

Nuttall contacted Francis about her DNA analysis of the bite swab. At that time, Nuttall considered Lazarus and Rasmussen's coworker persons of interest. Nuttall obtained a DNA sample from the coworker, which did not match the DNA on the bite swab. Detectives then obtained a DNA sample from Lazarus, which was consistent with the DNA on the swab. The investigation was then transferred to the robbery-homicide division of LAPD, where it was handled by Detectives Dan Jaramillo and Greg Stearns.

On June 5, 2009, Lazarus was arrested for Rasmussen's murder.[2]

On June 10, 2009, Shepard sent Francis an email to congratulate Francis on a promotion and, regarding the Rasmussen

---

[2] Lazarus was convicted of Rasmussen's murder in 2012, and the conviction was affirmed by Division Eight of this court in a published decision. (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 742, 793.)

murder, to "admit that [Francis was] on the right track with the love triangle theory."

Prior to the preliminary hearing in the case against Lazarus in December 2009, Francis became concerned that her testimony at the hearing would bring to light the statements Shepard made to her in 2005. Francis met with the prosecutor handling the hearing and told her that "Shepard had cleared" Lazarus as a suspect. According to Francis, the prosecutor told her that the information might be *Brady*[3] material and thus disclosed to the defense.[4]

On March 25, 2010, Francis told her supervisor, Harry Klann, that she did not want to work on the case against Lazarus. She expressed her concern that her testimony would reveal her 2005 conversations with Shepard and she was afraid of repercussions by the LAPD against her.

During this meeting, Francis told Klann about a dream she had shortly after Lazarus was arrested. In the dream, Shepard picked up Francis to drive her to court to testify. Shepard, however, drove east on Interstate 10 and pulled off the road into some tumbleweeds. Shepard put a gun on his leg and told Francis, "It's nothing personal, Jennifer, it's just business," then shot her.

After the meeting, Klann informed his supervisor, Jeff Thompson, that Francis was raising questions about a cover-up and conspiracy in the Rasmussen murder investigation and that she was concerned that detectives might retaliate against her.

---

[3] *Brady v. Maryland* (1963) 373 U.S. 83.

[4] In the defense case, the deputy district attorney with whom Francis spoke testified that she had no recollection that Francis expressed concerns about Shepard's handing of the Rasmussen investigation.

Klann also told Thompson that Francis "was having trouble sleeping" and "having trouble focusing or concentrating at work, related to the Lazarus case."

On May 26, 2010, Thompson asked Francis to his office so that he could assess her "demeanor and emotional state." Francis told Thompson that she was concerned that her disclosures about the Rasmussen murder investigation would embarrass LAPD detectives. During the meeting, Thompson told Francis that he understood that she was "a little stressed about the Lazarus case," and ordered her to see a psychologist with the LAPD's behavioral science services (BSS). Thompson explained during the trial in the instant case that he did so because Francis "was having issues with lack of sleep, issues with concentration," and her work as a DNA analyst requires that she "be very careful, very cognizant, [and] pay very close attention to whatever [she is] doing." According to Thompson, BSS "can help people with issues," and it is "not a bad thing."

Under LAPD policy, a mandatory referral to BSS can generally be made only by the employee's commanding officer. Thompson testified at trial that he is not Francis's commanding officer and his ordering of Francis to BSS violated that policy.

Francis attended the required four BSS sessions with a therapist. During the second session, the therapist told Francis that Francis had been ordered to BSS because she sleeps with a gun under her pillow. Francis, however, has never owned a gun and never told anyone she slept with a gun. According to Francis, she later talked to Klann and Thompson, who both said that she was sent to BSS because she sleeps with a gun under her pillow. During trial, Thompson denied this. According to Klann, Francis had told him that Nuttall advised Francis to get a gun and to "keep

6

it close[,] like sleep with it under her pillow," and Klann informed Thompson of Francis's statement.

About four weeks later, Francis arranged a meeting on June 30, 2010 with Nuttall and Jaramillo to discuss her concerns about her 2005 conversations with Shepard. Jaramillo brought Detective Debra Winter to the meeting to be a "witness." During the meeting, Nuttall and Francis expressed their concerns about the Rasmussen murder investigation and Shepard's failure to consider Lazarus as a suspect in 2005. Winter asked Francis whether she was making an allegation of misconduct, and Francis said she was not.

The day after the meeting, Klann (Francis's supervisor) spoke with Winter about the meeting. Winter told Klann that during the meeting Francis had referred to an email she had brought with her, but refused to provide it. Francis later identified the email as Shepard's June 10, 2009 email. According to Francis, she brought the email to the meeting and gave it to Nuttall so that Nuttall would have it in case "something happens to [her]."

Klann asked Francis for the email. Francis initially responded that she did not have it, then told Klann she was not comfortable providing it to him.

Klann then spoke with Thompson, who told Klann to order Francis to provide the email. Klann did so, and Francis brought a copy of the email to him about 15 minutes later.

On July 9, 2010, Thompson informed Francis that a deputy district attorney, Beth Silverman, did not want Francis testifying

in cases Silverman was handling, including a high profile murder case known as the "Grim Sleeper" case. Silverman had told Thompson that Francis was "defense expert number one" [and] "a tainted and problematic witness," and that she did not "want [Francis] touching her cases." Silverman also told Thompson that she "had heard things from [Detective] Stearns about [Francis]."[5]

In August 2010, Thompson met with Francis and told her that Klann alleged that Francis had failed to turn over an email that Klann had requested. Francis explained that she had turned over the email to Klann 15 minutes after he requested it, and complained that Klann was accusing her of dishonesty even though Klann had falsely reported that she slept with a gun. Francis told Thompson, " 'I want another supervisor.' " Thompson then "kind of yelled" back to Francis: " 'You don't get to pick your supervisor.' "

Francis further testified that, around this time period, she had asked Thompson at least three times to have a supervisor other than Klann, and was denied each time.

Francis believed that Klann thereafter set her up for failure. On one occasion, Francis was scheduled to give a presentation to a visiting delegation of the Japanese national police—what she considered a "prestige" assignment. Klann sent an email to Francis and two others saying that he needed someone "to review another

---

[5] During the defense case, Silverman testified that she had heard "talk in [the prosecutor's] office and . . . discussions about the fact that [Francis] was difficult to work with or that she wasn't really a team player or that she wanted to lead investigations and be the one to direct things." Silverman said that she did not ask that Francis not testify in the Grim Sleeper case; rather, it was that Silverman "needed one person . . . to be in charge of . . . all of the DNA work [so that] we wouldn't be sitting down and having to communicate with . . . [10] or 12 or 15 different DNA experts."

person in court." Francis told Klann about her presentation to the Japanese national police. Even though others were available to observe the witness in court, Klann told her, "No. You don't need to do that. Watch [the witness in court]." When Francis said she would talk to Thompson about it, Klann told her she could go make her presentation.

Francis also cited as an incident of retaliation the fact that Klann informed Francis that she would take Klann's place as a coordinator for a joint training academy with the Los Angeles County Sheriff's Department. The assignment required her to "scrambl[e] to find people to help [her] do it," but they "managed to do it."

In response to Francis's request to be transferred, Thompson offered to transfer her to "quality assurance" "for a few years." Although the position would pay the same as her current position, the transfer was to a "lower rank" position. Francis declined the offer.

A short time later, Thompson's supervisor, Greg Matheson assigned Francis a new supervisor, Vince Anderson. Sometime later, Anderson informed Francis that Klann "was possibly trying to start something with me" by complaining that Francis had a habit of answering questions with questions.

Francis worked for about 14 months under Anderson. During this period, she testified as an expert less frequently than she had previously.

In the spring of 2012, Francis had "had enough" and asked to leave the serology unit so she could be away from Klann and Thompson. In July 2012, she accepted an offer to work in the field investigation unit where she would process crime scenes.

On November 13, 2013, Yvette Burney, Francis's commanding officer, emailed Francis stating that effective November 18, she

9

was ordered to report perceived acts of retaliation against her to specified personnel. The email further stated that the order was issued to insure Francis's protection from retaliatory behavior. Francis informed Burney that the order was inconsistent with LAPD policy. Soon afterward, the order was rescinded.

In 2016, Francis asked for, and was granted, a transfer to the toxicology unit. Later that year, she requested, and was granted, a transfer back to the serology unit.

After Francis rested, the City moved for nonsuit. Among other grounds, the City argued that Francis failed to prove that the City had retaliated against her or that she suffered an adverse employment action. The court reserved ruling on the motion, and eventually denied it.

## DISCUSSION

The single cause of action Francis asserted at trial is for whistleblower retaliation in violation of Labor Code section 1102.5, subdivision (b). The relevant version of that statute provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." (Lab. Code, former § 1102.5, subd. (b); Stats. 2003, ch. 484, § 2, p. 3518.)

To prove a claim of retaliation under this statute, the plaintiff "must demonstrate that he or she has been subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment." (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386.) "Minor or relatively trivial adverse actions by employers or fellow employees that, from an objective perspective, are reasonably likely

10

to do no more than anger or upset an employee do not materially affect the terms or conditions of employment." (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1387 (*Patten*), disapproved on another point in *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703, 718, fn. 2; see also *McRae, supra,* 142 Cal.App.4th at p. 386 [the fact that an employee is displeased by an employer's action does not elevate that act to a materially adverse employment action].)  This requirement " ' "guards against both 'judicial micromanagement of business practices' [citation] and frivolous suits over insignificant slights." [Citation.]  Absent this threshold showing, courts will be thrust into the role of personnel officers, becoming entangled in every conceivable form of employee job dissatisfaction.' " (*McRae, supra,* at p. 387.)

The City contends that Francis failed to present substantial evidence of an adverse employment action and that the court therefore erred in denying its motion for nonsuit.  Before addressing the merits of this argument, we must address Francis's contention that the City cannot raise this argument because it did not file a cross-appeal.

An order denying a motion for nonsuit is not appealable (*Torres v. City of Los Angeles* (1962) 58 Cal.2d 35, 55), and, because the City was not aggrieved by the judgment, it did not have standing to appeal from the judgment (*Westside Center Associates v. Safeway Stores 23, Inc.* (1996) 42 Cal.App.4th 507, 520).  The City, therefore, acted appropriately in declining to file an appeal or cross-appeal.  The issue is thus whether the City, as a respondent on appeal, can, in addition to opposing Francis's contentions, raise the court's failure to grant its motion for nonsuit as an alternative ground for affirmance.  We hold that it can.

11

Under Code of Civil Procedure section 906, a respondent on appeal "may, without appealing from [the] judgment, request the reviewing court to [review,] and [the appellate court] may review[, nonappealable interim rulings] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which [the appellant] relies for reversal or modification of the judgment from which the appeal is taken."  The purpose of this rule " ' "is to allow a respondent to assert a legal theory which may result in affirmance of the judgment."  [Citation.]' " (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1121; accord, *Khorsand v. Liberty Mutual Fire Ins. Co.* (2018) 20 Cal.App.5th 1028, 1034; *Hong Sang Market, Inc. v. Peng* (2018) 20 Cal.App.5th 474, 487.)  Thus, a nonappealing defendant may "challenge the sufficiency of the [plaintiff's] evidence to the extent that the challenge results in a holding that plaintiff was not prejudiced by any errors." (*Carlotto, Ltd. v. County of Ventura* (1975) 47 Cal.App.3d 931, 935, fn. 4.)

Here, Francis contends:  (1) the jury instructions and special verdict form are erroneous and the court compounded these errors by its responses to jury questions; (2) the court failed to excuse several jurors for cause; (3) the court erroneously refused to issue a sanction or admonition concerning the City's alleged interference with Francis's efforts to depose her BSS therapist; (4) the court's response to a courtroom incident involving Silverman during the defense case was an abuse of discretion; and (5) the court erroneously admitted entire documents into evidence when only certain pages should have been introduced.  If, as the City contends, Francis failed to establish a necessary element of her claim as a matter of law and that nonsuit should therefore have been granted, any such errors are harmless and need not be addressed.

12

"A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) "In reviewing a grant of nonsuit, we are 'guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.' " (*Ibid.*)

Here, it is undisputed that the City never terminated Francis's employment, and never demoted her, suspended her, or denied her any pay. At the time of trial, her salary was greater than it was prior to her work on the Lazarus case. Francis did not offer evidence of any negative performance reviews. Indeed, in January 2013, the LAPD issued a commendation report recommending that Francis receive a police meritorious service medal based on her work in the Rasmussen murder investigation and her testimony in Lazarus's trial, which Francis acknowledged was the highest honor that she could receive as a civilian employee.

Francis contends that she suffered adverse employment actions in the following ways: (1) she was improperly ordered to attend therapy through BSS based on the false pretext that she slept with a gun under her pillow; (2) she was "taken off high profile

cases after she made her disclosure"; (3) Thompson told Francis that Klann had alleged she was being dishonest and had hidden the June 10, 2010 email from Shepard; (4) Thompson once "kind of yelled" to Francis: " 'You don't get to pick your supervisor' "; (5) Klann "interfered with her work or set[ ] her up for failure" when he "tried to send [Francis] to review another person in court" when she was scheduled to give a presentation to the Japanese national police; (6) Klann tried to disrupt a preplanned vacation by directing Francis to coordinate a training session with the Los Angeles County Sheriff's Department; (7) After Anderson was assigned as Francis's supervisor, Klann complained to Anderson that Francis liked to answer questions with more questions; (8) Francis testified less frequently than before she made her disclosures; and (9) In 2013, Francis's commanding officer sent her an email directing Francis to report perceived acts of retaliation in a manner that violated LAPD policy.

Whether viewed in isolation or collectively, the evidence of these actions is insufficient to permit a jury to find in Francis's favor. The direction to attend BSS therapy sessions, even if Thompson ordered them in violation of LAPD policy and the order was based on a pretext that Francis sleeps with a gun under her pillow, did not materially affect the terms, conditions, or privileges of Francis's employment. (Cf. *Caver v. City of Trenton* (3d Cir. 2005) 420 F.3d 243, 255−256 [requirement that police officer undergo a psychological evaluation was not an adverse employment action for purposes of whistleblower retaliation claim].) Francis was paid for her time during the four therapy sessions and they were completed within one month. According to Thompson, the therapy is "not a bad thing" and "can help people with issues." Although Francis argues that there is "a stigma" associated with "being sent to BSS," she points to no evidence of such a stigma or

14

other detrimental consequence in her case. She refers us to Detective Nutall's testimony that being "sent to BSS" "can be viewed as a negative connotation." Nutall, however, did not indicate that anyone viewed Francis in a negative light as a result of being ordered to BSS.[6]

The evidence that prosecutor Silverman decided she did not want Francis working on her cases does not constitute substantial evidence that the City or any of its employees subjected Francis to an adverse employment action. Silverman is a Los Angeles County Deputy District Attorney, not an employee of the City. Moreover, there is no evidence that Silverman's willingness to have Francis work on her cases was a term, condition, or privilege of Francis's employment or, if it was, that Silverman's decision was the result of any action by the City or any LAPD personnel. Francis argues on appeal that Silverman determined that Francis was a " 'tainted and problematic witness' " based in part on comments made by LAPD Detective Stearns. The only ostensible evidence on this

---

[6] Francis also cites to the testimony of two defense witnesses. One, a colleague of Francis's in the DNA serology unit, testified that "[t]here can be" a stigma attached to a BSS referral, but "it is dependent on the person." The second, a detective who worked on the Rasmussen murder investigation, was asked by Francis's counsel during cross-examination whether a referral to BSS "taint[s] the reputation of the person who's been referred." The detective agreed with Francis's counsel that people could be referred to BSS because they were involved in a shooting incident or exposed to "particularly gruesome suicide scenes," and added that BSS is also "there for people that are going through trauma or . . . had a death in their family . . . . It's not necessarily that the person is emotionally unstable or things . . . of that nature." Like Nutall's testimony, such testimony does not constitute substantial evidence that Francis suffered any stigma by being ordered to BSS.

point, however, is Francis's testimony that "Silverman had heard things from Stearns about [Francis]," given in response to a question as to whether Thompson told Francis that "Detective Stearns made negative comments about [Francis] as a witness." Even if this triple hearsay (Thompson told Francis that Silverman told Thompson that Silverman had "heard things from Stearns")[7] could be viewed as evidence that Stearns made unspecified negative comments about Francis to Silverman, it does not support a reasonable inference that such comments caused Silverman to decide not to use Francis as a witness.

We can quickly dispose of Francis's remaining contentions of adverse employment actions. The fact that Thompson told Francis that Klann had alleged she was being dishonest about failing to produce Shepard's June 10, 2010 email does not constitute an adverse employment action. Aside from the evidence that Francis initially falsely denied having the email, it does not appear from the record that Klann's allegation of dishonesty resulted in any disciplinary action or other negative consequence to Francis.

The fact that Thompson once "kind of yelled" to Francis, " 'You don't get to pick your supervisor,' " is the kind of trivial comment "that, from an objective perspective, [is] reasonably likely to do no more than anger or upset an employee"; it does "not materially affect the terms or conditions of employment." (*Patten*, *supra*, 134 Cal.App.4th at p. 1387.) The same is true of Klann's complaint to Anderson that Francis liked to answer questions with more questions, as well as Klann's incomplete

---

[7] Just prior to the question whether Thompson had told Francis that Stearns made negative comments about Francis, the City's counsel had interposed "a running objection" to Francis's counsel's questions on this issue on hearsay grounds, among others.

attempt to stop Francis's presentation to the Japanese national police delegation and his direction that Francis lead a training session with the Los Angeles Sheriff's Department.

Although Francis stated that she testified less frequently after her disclosures about Shepard and the Rasmussen murder investigation, she points to no evidence that frequently testifying was a material term, condition, or privilege of her employment or that any LAPD employee had anything to do with prosecutorial decisions as to whether or when she testified in criminal cases.

Lastly, the 2013 order from Francis's commanding officer directing Francis to report perceived acts of retaliation in a manner that violated LAPD policy cannot reasonably be viewed as a material adverse employment action. The order, which was ostensibly made for Francis's protection, was, at worst, inconsistent with LAPD policy and, once Francis pointed out that inconsistency, was promptly rescinded. Any effect on her employment was brief and inconsequential.

Whether the actions Francis relies on are viewed separately or collectively, they do not constitute substantial evidence of adverse employment actions that materially affected the terms, conditions, or privileges of Francis's employment. The evidence was thus insufficient to permit a jury to find in her favor. Accordingly, the court erred in failing to grant the City's motion for nonsuit. Because Francis does not claim that any errors she complains of effect whether the nonsuit should have been granted, we need not consider them.

17

**DISPOSITION**

The judgment is affirmed.

Respondent is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.

                                        ROTHSCHILD, P. J.

We concur:



        CHANEY, J.



        MORI, J.*

---

      **\*** Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18

Filed 7/22/22

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JENNIFER FRANCIS,<br><br>            Plaintiff and Appellant,<br><br>      v.<br><br> CITY OF LOS ANGELES,<br><br>            Defendant and Respondent. | B301021<br><br>(Los Angeles County<br>Super. Ct. No. BC526258)<br><br>CERTIFICATION AND<br>ORDER FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on June 30, 2022 and modified on July 22, 2022, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.            CHANEY, J.            MORI, J.*

_____

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.